**UNITED STATES of America, Plaintiff,**

v.

**Ruben ZUNO–ARCE, Defendant–Movant.**

**Nos. CV 98–2930–ER, CR 87–422(G)–ER.**

United States District Court,
C.D. California.

Aug. 18, 1998.

James E. Blancarte, James E. Blancarte Law Offices, Los Angeles, CA, Jack R. Luellen, Brega & Winters, Denver, CO, Timothy M. Thornton, Glodberg, Scott, Belfield & Cohen, Los Angeles, CA, for Ruben Zuno–Arce.

## ORDER DISMISSING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO VACATE, SET ASIDE OR CORRECT HIS SENTENCE

RAFEEDIE, Senior District Judge.

This case arises from the kidnapping, torture and murder of DEA Special Agent Enrique Camarena in Guadalajara, Jalisco, Mexico in February 1985. After being granted a new trial by the Court, a jury convicted defendant Ruben Zuno–Arce in a second trial on counts of conspiring to commit and committing violent crimes in aid of a racketeering enterprise, and conspiring to kidnap and kidnapping a federal agent. The Court of Appeals affirmed and the Supreme Court denied certiorari. Five years after Zuno–Arce's conviction, Hector Cervantes-Santos, a witness who testified at the first trial, signed a declaration stating that he had perjured himself at the urging of the Government. Based in large part on that declaration, Zuno–Arce, represented by counsel, has filed a motion for a new trial, which the Court has construed as a motion to vacate, set aside or correct a sentence, brought pursuant to 28 U.S.C. § 2255, in which he raises claims of double jeopardy, knowing use of perjured testimony, failure to disclose exculpatory evidence, and ineffective assistance of counsel. The Court has read and considered the papers filed in connection with this matter, conducted an evidentiary hearing on July 31, August 3 & 10, 1998, and now HEREBY DISMISSES IN PART and DENIES IN PART the motion for the reasons set forth below.

### I

#### A

Zuno–Arce [is alleged to have been] part of an international narcotics enterprise based in Guadalajara, Jalisco, Mexico.... Enrique Camarena–Salazar, an agent of the United States Drug Enforcement Agency, was, according to the government's evidence at trial, tremendously successful during 1984–85 in the performance of his duties. Billions of dollars worth of marijuana were seized in a single raid at "El Bufalo," a ranch owned by another of the cartel's members, Rafael Caro–Quintero. The cartel struck back violently. Agent Camarena was kidnapped in February 1985, taken to Caro–Quintero's house at 881 Lope de Vega in Guadalajara, and interrogated and tortured for two days. The interrogation was directed at finding out what information Camarena had about the cartel. After getting the information, the criminals murdered Agent Camarena [and his pilot/informant Alfredo Zavala-Avelar] and buried [them].

*United States v. Zuno–Arce*, 44 F.3d 1420, 1422 (9th Cir.1995), *cert. denied*, 516 U.S. 945, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995); *see also United States v. Zuno–Arce*, 958 F.2d 380, 1992 WL 59017 (9th Cir.1992). Zuno–Arce was among those indicted for the crime.

Zuno–Arce was tried twice. The first trial commenced on May 15, 1990 (*Zuno I* ); the defendants tried in that case were Zuno–Arce, Juan Ramon Matta–Ballesteros, Juan Jose Bernabe–Ramirez, and Javier Vasquez–Velasco. Hector Cervantes–Santos, a bodyguard to cartel member Javier Barba–Hernandez, testified on behalf of the Government and implicated Zuno–Arce, among others, in the conspiracy to kidnap and murder Agent Camarena. All four defendants were convicted. The Court granted Zuno–Arce a new trial, however, because the prosecutor had made an inappropriate reference in closing argument to a matter on which the Court had earlier prevented Zuno–Arce from presenting evidence. The jury's decision had been rendered without access to a defense exhibit that might have, in light of the prosecutor's comments, been helpful to Zuno–Arce's defense. The Court of Appeals affirmed the grant of a new trial in an unpublished disposition. *See United States v. Zuno–Arce*, 958 F.2d 380, 1992 WL 59017 (9th Cir.1992).

Zuno–Arce was retried along with a new defendant, Humberto Alvarez–Machain,[1] in a second trial on December 1, 1992 (*Zuno II* ). Cervantes–Santos did not testify in *Zuno II*. Instead, the Government used two new witnesses not previously called in *Zuno I* to implicate Zuno–Arce—Jorge Godoy–Lopez and Rene Lopez–Romero.[2] On December 21, 1992, after deliberating for only three and a half days, the jury found Zuno–Arce guilty of (1) conspiring to commit violent crimes in aid of a racketeering enterprise, 18 U.S.C. §§ 1959(a)(5), 2; (2) committing violent crimes in aid of a racketeering enterprise, 18 U.S.C. §§ 1959(a)(1), 2; (3) conspiring to kidnap a federal agent, 18 U.S.C. § 1201(c); and (4) kidnapping a federal agent, 18 U.S.C. §§ 1201(a)(5), 2. The Court sentenced Zuno–Arce on March 23, 1993 to life imprisonment on each of the kidnapping counts and ten years on each of the racketeering counts, all terms to run concurrently.

**B**

The timing of later federal proceedings is critical to the issues raised in this case. The defendant appealed several of the Court's rulings. The Ninth Circuit Court of Appeals affirmed on January 11, 1995, *see United States v. Zuno–Arce*, 44 F.3d 1420, 1422 (9th Cir.1995), and issued its mandate of affirmance on April 7, 1995. *See* Docket for Appeal No. 93–50311. The mandate was neither stayed nor recalled by the Court of Appeals or the United States Supreme Court. The Supreme Court denied the petition for a writ of certiorari on October 30, 1995. *See Zuno–Arce v. United States*, 516 U.S. 945, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995).

On July 1, 1997, five years after Zuno–Arce was convicted at the second trial, and seven years after Cervantes–Santos testified at the first trial, Cervantes–Santos signed a declaration in Los Angeles wherein he recanted his *Zuno I* testimony and stated that his perjury was guided and directed by the case agent, former DEA Special Agent Hector Berrellez, and one of the prosecutors, former Assistant United States Attorney Manuel Medrano.

Aside from the fact that the Cervantes–Santos declaration was obtained under dubious circumstances, a subject which the Court addresses in due course, the matter is further complicated by the fact that Cervantes–Santos has since changed his story—three times. On January 16, 1998, Cervantes–Santos repudiated his July 1, 1997 recantation. He disavowed the substance of his declaration in a videotape interview with DEA agents in Guadalajara, Jalisco, Mexico. According to Cervantes–Santos, the recantation

---

1. Alvarez–Machain, a doctor, was charged with keeping Camarena alive so that the torture and interrogation could continue. The Court acquitted him mid-way through the trial.

2. An account of the evidence brought at *Zuno II* against the defendant is set forth *infra* in Part IV.A.

was the product of coercion, both physical and psychological, at the hands of representatives of Zuno–Arce and Manuel Bartlett–Diaz, presently the Governor of the State of Puebla, Mexico. On March 8, 1998, Cervantes–Santos allegedly changed his story again. John Brown, a private investigator working on behalf on Bartlett–Diaz and now affiliated with the defense, claims that Cervantes–Santos told him that the DEA extracted the January 16, 1998 repudiation by threatening to send him to prison, promising to give him $162,000, and promising to place him in the witness protection program. And finally, on May 6, 1998, Cervantes–Santos again stepped forward, this time telling counsel for the Government in a videotape interview that he never said any such thing to John Brown.

Based on the July 1, 1997 declaration and other "newly discovered" evidence, Zuno–Arce filed on October 29, 1997 a motion for a new trial, pursuant to Rule 33 of the Rules of Criminal Procedure. The motion raised two claims: (1) *Mooney–Napue* violations: the Government knowingly presented false evidence in *Zuno II,* namely the perjured testimony of Godoy–Lopez and Lopez–Romero; and (2) *Brady–Bagley* violations: the Government failed to disclose exculpatory and impeachment evidence, including, among other things, that Cervantes–Santos lied during *Zuno I,* and that Godoy–Lopez and Lopez–Romero received additional pecuniary assistance from the Government.

Noting that the motion for a new trial was probably untimely, the Court issued an order on February 25, 1998, *see* CR docket # 2213, in which it invited both parties to address whether the Court should dismiss the motion, pursuant to *United States v. Cook,* 705 F.2d 350, 351 (9th Cir.1983), for lack of jurisdiction. Both parties timely responded, and the Court issued an order on March 30, 1998 dismissing the motion for lack of jurisdiction—the motion had been filed six months

too late. *See* CR docket # 2226. In a gesture normally afforded to *pro se* litigants, the Court construed the motion for a new trial as a motion to vacate, set aside or correct a sentence, brought pursuant to 28 U.S.C. § 2255. The Court ordered the defendant to file and serve the § 2255 forms required by our local rules and noted that it would deem such forms and the § 2255 motion filed *nunc pro tunc* on the date of October 29, 1997 (the date the motion for a new trial was filed).[3] The Court also ordered that the papers filed in connection with the motion for a new trial, including the Government's already-filed opposition, become part of the record to be considered in resolving Zuno–Arce's § 2255 motion.

Zuno–Arce filed the forms as required. *See* CR docket # 2231. But the forms that were submitted added two claims not previously set forth in the motion for a new trial—double jeopardy and ineffective assistance of counsel. Specifically, Zuno–Arce now also argues that (1) the Government's knowing use of Cervantes–Santos's perjured testimony in *Zuno I* precluded Zuno–Arce's retrial in *Zuno II* under the Double Jeopardy Clause and (2) counsel's failure to timely file the motion for a new trial constituted ineffective assistance of counsel. The Government has objected to the inclusion of these new claims.

## II[4]

The Court first addresses Zuno–Arce's claim that his attorneys rendered ineffective assistance by failing to timely file his motion for a new trial. According to Zuno–Arce, his attorneys were "aware of evidence and grounds sufficient to timely bring a meritorious new trial motion. If such a motion had been brought and considered by the court, a new trial would have been granted." Form for Motion to Vacate, Set Aside or Correct Sentence 5 (CR docket # 2231). Ultimately,

---

3. The Court also ordered the parties to address whether all or parts of Zuno–Arce's recently-construed § 2255 motion should be dismissed as untimely under the Anti–Terrorism and Effective Death Penalty Act's one-year period of limitations. The effect of the period of limitations is addressed *infra* in Parts III–IV.

4. Unless otherwise stated, the movant bears the burden of establishing by a preponderance of the evidence all facts necessary to support his claims of constitutional violation. *See Parke v. Raley,* 506 U.S. 20, 31, 113 S.Ct. 517, 524, 121 L.Ed.2d 391 (1992).

the claim may not go forward because Zuno–Arce impermissibly added the ineffective assistance claim to the § 2255 motion and Zuno–Arce had no right to the assistance of counsel on his motion for a new trial.

### A

■ When the Court issued its order dismissing as untimely Zuno–Arce's motion for a new trial, the Court construed the belated motion as a motion to vacate, set aside or correct a sentence, brought pursuant to 28 U.S.C. § 2255. *Cf. United States v. Nguyen,* 997 F.Supp. 1281, 1295 (C.D.Cal.1998) (construing a defendant's motion liberally is usually reserved for those who appear *pro se*). To complete the liberal construction, the Court ordered the defendant to file and serve the § 2255 forms required by our local rules, *see* C.D.Cal.Rule 26 (stating that § 2255 motions must be filed on forms approved and supplied by the Court), which the Court would deem filed *nunc pro tunc* on the same date the motion for a new trial was filed. But as the Court noted *supra,* the forms submitted by Zuno–Arce added, without prior leave of the Court, and without consent of the Government, a claim of ineffective assistance of counsel.

The rules pertaining to the amendment of § 2255 motions are set forth by the combination of the Rules Governing Section 2255 Proceedings and the Federal Rules of Civil Procedure. "[T]he district court may ... apply the Federal Rules of Criminal Procedure or the Federal Rules of Civil Procedure, whichever it deems most appropriate, to [§ 2255] motions filed under these rules."

Rule 12 of the Rules Governing Section 2255 Proceedings.

Federal Rule of Civil Procedure 15(a), which has been held applicable to § 2254 proceedings, *see Calderon v. U.S. Dist. Court,* 134 F.3d 981, 986 n. 6 (9th Cir.1998), states in pertinent part:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading *only by leave of court* or by written consent of the adverse party....

Fed.R.Civ.P. 15(a) (emphasis added). Application of Rule 15 to § 2255 proceedings, albeit with minor adjustments, is entirely possible and appropriate.

The proper rule is that a movant may not amend a § 2255 motion without first seeking leave of the Court if the Government has already filed an opposition which "respond[s] to the allegations of the [original] motion." [5] Rule 5 of the Rules Governing Section 2255 Proceedings (describing content of answer); *see also United States v. Cervantes,* 132 F.3d 1106, 1111 (5th Cir.1998) (opposition testing allegations of § 2255 motion precludes unilateral amendment).[6]

Because the Government had already filed its opposition to Zuno–Arce's § 2255 motion—more accurately the then-labeled "motion for a new trial"—Zuno–Arce had no right to amend his § 2255 motion without

---

**5.** Rule 15(d), to the extent applicable to this case, also requires that a party first seek permission from the Court before supplementing the pleadings: "Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Fed.R.Civ.P. 15(d).

**6.** The Court rejects the Government's argument that Zuno–Arce's amendment is equivalent to a "second or successive" motion requiring prefiling certification from the Court of Appeals. *See*

28 U.S.C. §§ 2255, 2244(b)(3). The original motion for a new trial was dismissed on procedural grounds and was not heard on the merits. *See United States v. Gutierrez,* 116 F.3d 412, 416 (9th Cir.1997) (the "dismissal of a § 2255 motion as successive can only be sustained if the prior motion was determined against the [movant] on the merits"). Furthermore, this is not a capital case and § 2266(b)(3)(B) is inapplicable. *See* 28 U.S.C. § 2266(b)(3)(B) ("No amendment to an application for a writ of habeas corpus [in a capital case] shall be permitted after the filing of the answer to the application, except on the grounds specified in [the section governing successive applications].").

leave of the Court.[7] No motion or application to amend was filed with the Court. This is so even though Zuno–Arce had several opportunities to seek leave (some after the Government objected to the claim's inclusion). *See, e.g.,* Form for Motion to Vacate, Set Aside or Correct Sentence (CR docket # 2231); Petitioner's Response to Order to Show Cause (CR docket # 2233); Reply to Government's Opposition to Petitioner's Response to Order to Show Cause (CR docket # 2238); Comprehensive Reply to All Government Oppositions (CR docket # 2253).

Zuno–Arce was represented by no less than three experienced attorneys at the time he impermissibly amended his § 2255 motion, and the Court will not liberally construe their actions as an implicit request for leave to amend. *See Nguyen,* 997 F.Supp. at 1295. A formal noticed motion was required. *See* C.D.Cal.Rule 7.4.2 (1998) ("Unless otherwise provided by rule or order of the Court, no oral motions will be recognized and every motion shall be presented by written notice of motion."); C.D.Cal.Rule 7.4 (1993) (same). Thus, Zuno–Arce's ineffective assistance of counsel claim is not properly before the Court.

**B**

■ The Government submits, in the alternative, that Zuno–Arce's ineffective assistance of counsel claim fails as a matter of law because an accused is ·not constitutionally entitled to counsel on a motion for a new trial that has been filed two years after the completion of direct appeal. This claim has merit.

The right to effective assistance of counsel is dependent on the right to counsel itself. *See Wainwright v. Torna,* 455 U.S. 586, 587–88, 102 S.Ct. 1300, 1301, 71 L.Ed.2d 475 (1982). As our circuit has recently stated:

> Of course, a defendant can only obtain reversal on Sixth Amendment grounds if the error complained of occurred at a criti-

cal stage in the adversary proceedings. This is true because the Sixth Amendment guarantees the right to counsel only at critical stages. It therefore follows that, if the stage is not critical, there can be no constitutional violation, no matter how deficient counsel's performance.

*United States v. Benlian,* 63 F.3d 824, 827 (9th Cir.1995) (citations omitted). The issue before the Court is whether a motion for a new trial which has been filed following a defendant's exhaustion of his direct appeal constitutes a critical stage thus entitling the defendant to the assistance of counsel. Ultimately, the Court answers the question in the negative.

Zuno–Arce refers the Court to *Menefield v. Borg* in support of his position. 881 F.2d 696 (9th Cir.1989). In *Menefield,* a panel of the Ninth Circuit Court of Appeals held that, in light of California law, a motion for a new trial brought immediately following a conviction is a critical stage of prosecution for purposes of the Sixth Amendment. *See id.* at 698–99. The decision, however, is materially distinguishable from the case presently before the Court. First, the Court of Appeals relied on the exacting nature of the "new trial" relief available in California Penal Code § 1181. *See Menefield,* 881 F.2d at 699. The court noted that § 1181 provides nine distinct grounds for relief which serve with one exception [8] as the exclusive grounds for such a motion, and that the accused in the case had trouble understanding the "intricacies of the California statute governing new trials." *Menefield,* 881 F.2d at 697, 699.

Such a strict structure is not found, however, in the more flexible federal new trial rule. *See* Fed.R.Crim.P. 33; *United States v. Phillips,* 974 F.Supp. 491, 497 (D.Md.1997) (comparing Rule 33 motion with state new trial motions). The distinction is important because it lessens the need for skilled counsel to assist the accused to understand "the legal confrontation" inherent in a motion for a new trial. *Menefield,* 881 F.2d at 699.

---

**7.** Specifically, the Court deemed "the government's oppositions to the motion for a new trial as part of the record to be considered in resolving Zuno–Arce's § 2255 motion." Order of March 30, 1998 (CR docket # 2226).

**8.** A trial court may also grant a motion for a new trial on the ground of ineffective assistance of counsel. *See People v. Fosselman,* 33 Cal.3d 572, 582–583, 189 Cal.Rptr. 855, 861, 659 P.2d 1144 (1983).

Second, the decision does not purport to pertain to motions filed after the termination of the appellate process, whether that termination comes by exhaustion or waiver. The Supreme Court has held that criminal defendants do not have a constitutional right to counsel when "mounting collateral attacks upon their convictions." *Pennsylvania v. Finley*, 481 U.S. 551, 555 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539 (1987). The Court stated:

> Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further. . . . We think that since a defendant has no federal constitutional right to counsel when pursuing a discretionary appeal on direct review of his conviction, *a fortiori*, he has no such right when attacking a conviction that has long since become final upon exhaustion of the appellate process.

481 U.S. at 555, 107 S.Ct. at 1993. The case law clearly reflects a judgment that an accused's right to counsel must end some time. *See also Duckett v. Godinez*, 67 F.3d 734, 750 n. 8 (9th Cir.1995) ("The right to counsel extends only through trial and the first appeal of right."), *cert. denied*, 517 U.S. 1158, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996).

The import of the decision in *Finley* and its progeny is that courts should construe a post-appeal motion for a new trial as a collateral proceeding where one is not entitled to counsel. Decisions in other circuits have echoed this principle. For instance, the First Circuit Court of Appeals held that after final conviction and the first appeal, the appointment of counsel on a motion for a new trial was not constitutionally guaranteed, but rather rested in the discretion of the court. *See Dirring v. United States*, 353 F.2d 519, 520 (1st Cir.1965) (cited with approval in *United States v. Tajeddini*, 945 F.2d 458,

469–70 (1st Cir.1991)). The District of Columbia and Second Circuits have followed this approach, albeit without expressly reaching the constitutional question. *See, e.g., United States v. Lee*, 513 F.2d 423, 424 (D.C.Cir.1975) (neither 18 U.S.C. § 3006A nor Fed.R.Crim.P. 44 require appointment of counsel on a motion for a new trial filed after first direct appeal); *United States v. Birrell*, 482 F.2d 890, 892 (2d Cir.1973) (same). Having found *Menefield* distinguishable and the reasoning of other decisions persuasive, the Court concludes that a defendant is not entitled to the assistance of counsel on a motion for a new trial that has been filed two years after termination of the direct-appellate process.[9]

Because Zuno–Arce has no constitutional right to counsel on a motion for a new trial following the exhaustion of the direct-appellate process, he cannot complain that counsel was constitutionally defective by failing to timely file the motion for a new trial. Zuno–Arce's allegations, taken as true, do not entitle him to relief.

### III

Zuno–Arce's remaining claims more directly implicate the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA) and its one-year period of limitations.[10] The Court recognized as much in its Order dated March 30, 1998, where it asked counsel for both parties to address whether the § 2255 motion, or parts thereof, should be dismissed as untimely. *See* CR docket # 2226.

Under the AEDPA, a one-year period of limitations applies to § 2255 motions:

> A 1–year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—

**9.** The decisions in *United States v. Del Muro*, 87 F.3d 1078, 1080 (9th Cir.1996), and *Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir.1990), add no further support to Zuno–Arce's cause. Both cases simply cite *Menefield* with no independent analysis. In any event, neither case dealt with a motion filed after exhaustion or waiver of the appellate process.

**10.** Because Zuno–Arce's § 2255 motion was filed on October 29, 1997, the provisions of the AED-

PA apply. *See Calderon v. U.S. Dist. Court*, 128 F.3d 1283, 1287 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 899, 139 L.Ed.2d 884 (1998); *Jeffries v. Wood*, 114 F.3d 1484, 1493–1501 (9th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997). This is Zuno–Arce's first motion to vacate, set aside or correct his sentence, and thus the AEDPA's limitations on successive motions do not apply.

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255 (as amended).

In this case, because the motion was submitted on a new factual predicate, the limitation period began to run on "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." *Id.* § 2255(4). Thus, for Zuno–Arce's § 2255 motion, or portions thereof, to proceed he must demonstrate to the Court's satisfaction that the facts supporting his claims could not have been discovered through the exercise of due diligence before October 30, 1996—one year before the present motion was filed.[11] It appears from the record that some of the evidence filed in support of the present motion was actually discovered, or could have been discovered through the exercise of due diligence, before October 30, 1996. Accordingly, application of the AEDPA would require that the Court dismiss those portions of the motion that are time-barred.

Before further discussing the effect of the one-year statute of limitation in this case, however, the Court must first address two arguments raised by the defendant, either of which, he would have the Court hold, permits the Court to consider all of the claims and evidence submitted without regard to the AEDPA's limitations period. Zuno–Arce first asks the Court to utilize his ineffective assistance of counsel claim (more specifically the prejudice inquiry of such a claim) as a vehicle for considering evidence that might otherwise be excluded.[12] And second, Zuno–Arce seeks an extension and application of the *Schlup v. Delo* "miscarriage of justice" gateway to his case. 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).[13]

**A**

Zuno–Arce first argues that the Court should consider all of the claims and evidence submitted in support of his motion to vacate without regard to the AEDPA's statute of limitations because the Court will have to consider it in any event when considering Zuno–Arce's claim for ineffective assistance counsel. This follows because the Court must, in reviewing counsel's performance, determine whether there "is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Bonin v. Calderon,* 59 F.3d 815, 833 (9th Cir.1995) (citations omitted), *cert. denied,* 516 U.S. 1051, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996). To be more precise, to determine whether construing the motion for a new trial as a § 2255 motion prejudiced Zuno–Arce, the Court would have to consider the evidence properly submitted in support of the motion for a new trial, compare it to the evidence permitted on the § 2255 motion, and then determine whether it would have made a difference. The Court rejects this argument. Zuno–Arce's ineffective assistance claim has already been both procedurally and substantively rejected. Therefore, that claim may not be used as a vehicle to

---

**11.** This is precisely what the Court ordered Zuno–Arce to do in its March 30, 1998 Order. *See* CR docket # 2226.

**12.** *See* Petitioner's Response to Order to Show Cause 6–7 (CR docket # 2233); Reply to Government's Opposition to Petitioner's Response to Order to Show Cause 13–14 (CR docket # 2238).

**13.** *See* Petitioner's Response to Order to Show Cause 3–6 (CR docket # 2233); Reply to Government's Opposition to Petitioner's Response to Order to Show Cause 15–16 (CR docket # 2238). Zuno–Arce does not, however, raise a freestanding claim of actual innocence, as that claim is described in *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).

consider otherwise-barred claims and evidence.

**B**

Zuno–Arce next seeks an extension of the miscarriage of justice gateway to permit him to overcome the AEDPA's statute of limitations. The miscarriage of justice gateway, first identified by a plurality in *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (Powell, J.), and then delineated in *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), is a limited exception to the rule that a court will not consider pre-AEDPA habeas petitions or motions that are abusive, successive, or procedurally defaulted. Under the gateway, a court may review otherwise-barred constitutional claims where the movant makes a colorable showing of actual innocence, *i.e.,* "persuades the district court [that it is more likely than not] that, in light of ... new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 329, 115 S.Ct. at 868.

Zuno–Arce correctly notes that the AEDPA's one-year limitation period is not a jurisdictional bar and may be equitably tolled in extraordinary circumstances. *See Calderon v. U.S. Dist. Court,* 128 F.3d 1283, 1287–89 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 899, 139 L.Ed.2d 884 (1998); *Miller v. Marr,* 141 F.3d 976, 978 (10th Cir.1998). In light of this fact, the Court first addresses whether an actual innocence claim under *Schlup* constitutes an "extraordinary circumstance" permitting the consideration of otherwise-barred claims and evidence.

Federal courts have applied the doctrine of equitable tolling in two generally distinct kinds of situations. In the first, the [mov-

ant is] prevented from asserting [his] claims by some kind of wrongful conduct on the part of the [government]. In the second, *extraordinary circumstances* beyond [a movant's] control made it impossible to file the claims on time.

*Alvarez–Machain v. United States,* 107 F.3d 696, 701 (9th Cir.1996) (citation omitted) (emphasis added); *see also Calderon,* 128 F.3d at 1288–89 ("Equitable tolling will not be available in most cases, as extensions of time will only be granted if *'extraordinary circumstances' beyond a prisoner's control* make it impossible to file a petition [or motion] on time." (emphasis added)). Our circuit has warned that district court judges should "take seriously Congress's desire to accelerate the federal habeas process, and [should] only authorize extensions when this high hurdle is mounted." *Id.*

A claim of actual innocence would not constitute an "extraordinary circumstance," as that term is understood in the context of equitable tolling. To receive the benefit of equitable tolling, a § 2255 movant must, at the very least, allege that circumstances beyond his control or government misconduct contributed to his inability to file his motion on time. No such allegations have been made, nor could they in this case, and thus Zuno–Arce is not entitled to equitable tolling.

It remains to be decided, however, whether a colorable showing of factual innocence nevertheless permits consideration of claims despite a violation of the statute of limitations.[14] Zuno–Arce argues that the Court should equate the one-year limitation period to other procedural bars to which the gateway has already been applied. The statute of limitations is similar in a sense to the procedural default doctrine, which bars habe-

---

14. The Court assumes for purposes of this motion that the "cause" portion of the "cause and prejudice" test, defined in *Murray v. Carrier,* 477 U.S. 478, 488–90, 106 S.Ct. 2639, 2645–46, 91 L.Ed.2d 397 (1986), and ordinarily the first hurdle a movant must attempt to overcome before proceeding with a barred claim, is the equivalent of the equitable tolling doctrine applicable to the AEDPA's statute of limitations. The standards are somewhat similar. Zuno–Arce's attempt to satisfy the "cause" prong of the test by alleging ineffective assistance of counsel, *see Carrier,* 477

U.S. at 488, 106 S.Ct. at 2645; *United States v. De la Fuente,* 8 F.3d 1333, 1337 (9th Cir.1993), has already been rejected by the Court *supra* in Part II. Because Zuno–Arce is unable to satisfy the "cause" prong of the test and would thus be required instead to meet the miscarriage of justice standard, *see Sawyer v. Whitley,* 505 U.S. 333, 338–39, 112 S.Ct. 2514, 2518–19, 120 L.Ed.2d 269 (1992) (describing relation between "cause and prejudice" test and "miscarriage of justice" gateway), the Court moves directly to whether the gateway applies.

as review of constitutional claims that a movant has failed to present at procedurally required opportunities, such as at trial, *see Wainwright v. Sykes,* 433 U.S. 72, 86–87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977), sentencing, *see Evenstad v. United States,* 978 F.2d 1154, 1158 (9th Cir.1992), or on direct appeal, *see United States v. Schlesinger,* 49 F.3d 483, 484–84 (9th Cir.1994). And in a sense the limitations period is similar to the abuse-of-the-writ doctrine, which forecloses habeas claims that were available but not relied upon in a previous motion or petition. *See Kuhlmann v. Wilson,* 477 U.S. 436, 444 n. 6, 106 S.Ct. 2616, 2622 n. 6, 91 L.Ed.2d 364 (1986).

However, those two doctrines are for the most part creations of the judicial branch, *see Wainwright,* 433 U.S. at 86–88, 97 S.Ct. at 2506–2507 (procedural default doctrine); *McCleskey v. Zant,* 499 U.S. 467, 479–89, 111 S.Ct. 1454, 1462–67, 113 L.Ed.2d 517 (recounting common-law groundwork of abuse-of-the-writ doctrine),[15] and, thus, the notion of separation of powers is not as easily offended when the judiciary carves out an exception to these doctrines, *see McCleskey,* 499 U.S. at 490–91, 111 S.Ct. at 1468 ("A federal habeas court's power to excuse these types of defaulted claims derives from the court's equitable discretion."). Moreover, unlike in the present case, neither doctrine comes coupled with a mandate from Congress that motions be filed within a specified period of time. Naturally, the Court is reluctant to disregard what appears to be the plain letter of the AEDPA. *See Thomas v. Arn,* 474 U.S. 140, 148, 106 S.Ct. 466, 471–72, 88 L.Ed.2d 435 (1985) ("Even a sensible and efficient use of the supervisory power ... is

invalid if it conflicts with ... statutory provisions.").

█ At least on equal footing, and most likely paramount, however, is the fact that a court may not disregard constitutional provisions. *See Bank of Nova Scotia v. United States,* 487 U.S. 250, 254, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988); *Thomas,* 474 U.S. at 148, 106 S.Ct. at 471–72. Thus, in deciding whether to extend the gateway to overcome the procedural bar of a statute of limitations, the Court also bears in mind that to bar a constitutional claim, coupled with a claim of actual innocence, on an accused's first motion to vacate implicates serious constitutional concerns. "Dismissal of a *first* federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty." *Lonchar v. Thomas,* 517 U.S. 314, 324, 116 S.Ct. 1293, 1299, 134 L.Ed.2d 440 (1996). The Constitution may require when a claim of actual innocence is involved that habeas review remain open until the defendant has had at least one meaningful opportunity for review. To foreclose review in this sort of case might violate the Cruel and Unusual Punishments or Suspension Clauses. *See* U.S. Const. amend. VIII; *id.* art. II, § 9, cl. 2. In fact, every court which has had an opportunity to address how an actual innocence claim operates post-AEDPA has either avoided the matter altogether by ruling on an alternate ground,[16] or has avoided the risk of constitutional implications by either permitting the § 2255 movant to raise his otherwise-barred claim under 28 U.S.C. § 2241 [17] or by assuming that the miscarriage of justice gateway would permit the barred claim to go forward.[18]

**15.** *See also Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 2340, 135 L.Ed.2d 827 (1996) (the AEDPA "codifies some of the pre-existing limits on successive petitions").

**16.** *See, e.g., In re Jones,* 137 F.3d 1271, 1273 & n. 3 (11th Cir.1998) (declining to address whether claim of actual innocence permits successive petition under 28 U.S.C. § 2244(b)(1)); *Breard v. Pruett,* 134 F.3d 615, 620 (4th Cir.) ("[W]e find it unnecessary to address the issue of whether the AEDPA abrogated the 'miscarriage of justice' exception to the procedural default doctrine."), *cert. denied,* —— U.S. ——, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998); *In re Waldrop,* 105 F.3d

1337, 1338 (11th Cir.1997) (declining to address whether claim of actual innocence permits abusive petition under 28 U.S.C. § 2244(b)(2)(B)); *McDonald v. Bowersox,* 125 F.3d 1183, 1186 (8th Cir.1997) (same); *Bush v. Singletary,* 99 F.3d 373, 375 (11th Cir.1996) (same).

**17.** *See Triestman v. United States,* 124 F.3d 361 (2d Cir.1997); *In re Dorsainvil,* 119 F.3d 245 (3d Cir.1997); *United States v. Lorentsen,* 106 F.3d 278 (9th Cir.1997).

**18.** *See Alexander v. Keane,* 991 F.Supp. 329, 334–339 (S.D.N.Y.1998) (assuming, but only after

The opinion in *Triestman v. United States,* 124 F.3d 361 (2d Cir.1997), is instructive in this regard. There the Second Circuit Court of Appeals held that where a successive § 2255 motion raises *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995),[19] as the basis for a claim of actual innocence, the threat of constitutional implications arising from procedurally barring the claim requires that the movant be permitted to raise his claim via a petition for a writ of habeas corpus. *See* 28 U.S.C. § 2241.

Well aware of the fact that the unavailability of § 2255 motion does not automatically entitle a defendant to move pursuant to § 2241, *see In re Vial,* 115 F.3d 1192, 1194 n. 5 (4th Cir.1997), *Triestman* tackled the issue of whether barring the *Bailey* claim altogether would offend the Constitution. The court persuasively concluded that the continued incarceration of an innocent person might constitute cruel and unusual punishment, *see Triestman,* 124 F.3d at 378–79 (citing *Herrera v. Collins,* 506 U.S. 390, 432 n. 2, 113 S.Ct. 853, 877 n. 2, 122 L.Ed.2d 203 (1993) (Blackmun, J., dissenting)), and that to "close off all avenues of redress in such cases" would likely constitute a violation of the Due Process Clause of the Fifth Amendment. *Triestman,* 124 F.3d at 378–79.[20] Wishing to avoid the constitutional questions in its case and in all future similar cases, the Court of Appeals concluded that a second or successive § 2255 motion was truly "inadequate and ineffective to test the legality of [a prisoner's] detention" where the basis for the challenge was *Bailey v. United States.* Accordingly, the court ruled that a § 2255 mov-

ant who would be otherwise-barred by the limit on second or successive motions should raise a *Bailey* claim via a petition for a writ of habeas corpus.

The Third Circuit Court of Appeals echoed the concerns of *Triestman* in a decision decided only days before, *see In re Dorsainvil,* 119 F.3d 245 (3d Cir.1997), where it too chose to avoid "thorny constitutional issue[s]" by permitting § 2255 movants to file otherwise procedurally-barred *Bailey* claims under § 2241. Our own circuit has reached the same conclusion—albeit with little analysis. *See United States v. Lorentsen,* 106 F.3d 278, 279 (9th Cir.1997).

Although the *Bailey* claims raised in *Triestman* and *Dorsainvil* are more akin to a freestanding actual innocence claim, *see Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the reasoning of those cases remains instructive.

In a well-reasoned and thorough opinion, Judge Sotomayor has extended the reasoning of *Triestman* and *Dorsainvil* to conclude that failing to extend the miscarriage of justice gateway to overcome the procedural bar of the AEDPA's statute of limitations would likely violate the Constitution. *See Alexander v. Keane,* 991 F.Supp. 329, 334–39 (S.D.N.Y.1998). Accordingly, Judge Sotomayor chose to avoid the possible constitutional implications by applying the miscarriage of justice gateway to the § 2254 petitioner in that case.[21]

The Court finds further support for application of the miscarriage of justice gateway

---

substantial analysis, that a § 2254 petitioner could raise a claim barred by the statute of limitations if a colorable showing of factual innocence was provided).

**19.** In *Bailey,* the Supreme Court narrowly construed the phrase "uses a firearm," 18 U.S.C. § 924(c), so as to de-criminalize the actions of some defendants charged with the offense. Defendants who have previously filed a § 2255 motion before *Bailey* are barred by the literal terms of § 2255's limitation on second or successive motions from filing a new motion based on *Bailey.* This follows because § 2255 does not permit a defendant to file a second or successive motion based on a change in (or more accurately an interpretation of) substantive law. *See* 28 U.S.C. § 2255 (as amended). Rather, a movant

may only file a second or successive motion if based on newly discovered evidence which tends to show a defendant's factual innocence or if based on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court. *See id.* *Bailey* claims are inherently based on neither ground.

**20.** The court also flagged the fact that barring a *Bailey* claim might also present a serious constitutional issue under the Suspension Clause, but declined to discuss the matter further. *See Triestman,* 124 F.3d at 378 n. 21.

**21.** Judge Sotomayor's analysis need not be recounted here. Ultimately, the court denied the petition because the petitioner failed to satisfy the showing required by *Schlup.*

to post-AEDPA cases in the Supreme Court's recent decision *Calderon v. Thompson,* 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). Although the case involved setting the proper standard for recalling a mandate following a court of appeals' denial of habeas relief, the Supreme Court stated in that context that the "miscarriage of justice standard is altogether consistent ... with [the] AEDPA's central concern that the merits of concluded criminal proceedings not be revisited in the absence of a strong showing of actual innocence." *Id.* 523 U.S. at ——, 118 S.Ct. at 1502; *see also id.* (the "standard comports with the values and purposes underlying [the] AEDPA").

The reasoning of the cases noted above is persuasive, and the Court now holds that to foreclose a claim of constitutional violation where there has been a colorable showing of factual innocence would likely constitute a due process violation or an improper suspension of habeas corpus relief. In order to provide an avenue of review, the Court now extends the miscarriage of justice gateway as a means of considering evidence and constitutional claims otherwise procedurally barred by the AEDPA's period of limitations.

## IV

 The Court next addresses whether Zuno–Arce has satisfied the miscarriage of justice gateway standard. An otherwise-barred constitutional claim, and the evidence to support it, may be considered if the movant produces reliable new evidence not admitted at trial which demonstrates that it is more likely than not that no reasonable juror would have convicted him. *See Schlup,* 513 U.S. at 326–28, 115 S.Ct. at 867. A court is to "consider all relevant evidence: that presented at trial; that arguably wrongly excluded from trial; and that unavailable at trial." *Battle v. Delo,* 64 F.3d 347, 352 (8th Cir.1995), *cert. denied,* 517 U.S. 1235, 116 S.Ct. 1881, 135 L.Ed.2d 176 (1996). "To be credible, [a claim of actual innocence] re-

quires petitioner to support his allegations of constitutional error with *new reliable* evidence ... that was *not presented at trial.*" *Schlup,* 513 U.S. at 324, 115 S.Ct. at 865 (emphasis added). Thus, as important as it is to consider the new evidence of actual innocence, it is equally important to look to the source of that evidence.[22] All things considered, the evidence must undermine the Court's confidence in the outcome of the trial. *See id.* at 316, 115 S.Ct. at 861. The Court bears in mind that in order to pass through the gateway, a movant's case must be "truly extraordinary," *id.* at 327, 115 S.Ct. at 867, for a defendant having been convicted by a jury comes before the Court with a "strong—and in the vast majority of cases conclusive—presumption of guilt," *id.* at 326 n. 42, 115 S.Ct. at 866 n. 42.

### A

The Court first recounts the evidence presented against Zuno–Arce during *Zuno II.* The thrust of the Government's case was that Zuno–Arce and others[23] jointly operated a marijuana and cocaine trafficking enterprise centered in Guadalajara, Jalisco, Mexico. During 1984, the Drug Enforcement Administration (DEA) made several significant seizures of marijuana and cocaine which resulted in substantial losses, numbering in the billions of dollars, for the enterprise. By late 1984/early 1985, the cartel had identified the responsible DEA agent as Special Agent Enrique Camarena.

On February 7, 1985, Agent Camarena was kidnapped in front of the American Consulate in Guadalajara, and his pilot, Alfredo Zavala–Avelar, was kidnapped while returning home from the Guadalajara airport. On about March 5, 1985, their decomposed bodies were found in an open field in Zamora, Michoacan, approximately sixty miles south of Guadalajara. Forensic evidence showed that Camarena had previously been buried in Primavera Park, a large park out-

**22.** The Court, however, is "not bound by the rules of admissibility that would govern at trial." *Schlup,* 513 U.S. at 327–28, 115 S.Ct. at 867.

**23.** The other indicted persons included: Rafael Caro–Quintero, Ernesto Fonseca–Carrillo, Juan

Ramon Matta–Ballesteros, Miguel Angel Felix–Gallardo, Manuel Ibarra–Herrera, Miguel Aldana–Ibarra, Javier Barba–Hernandez, Juan Jose Bernabe–Ramirez, and Javier Vasquez–Velasco.

side of Guadalajara. The bodies of both men were bound, gagged and blindfolded. Both had been badly beaten. The Government's theory of the case was that the cartel kidnapped, tortured, and murdered Camarena in furtherance of its drug enterprise.

Zuno–Arce's membership in the cartel was established through the testimony of Lawrence Harrison, an engineer working for cartel member Ernesto Fonseca–Carrillo, and Jorge Godoy–Lopez and Rene Lopez–Romero, both former state policemen and bodyguards to Fonseca–Carrillo. According to the testimony at trial, Zuno–Arce was a narcotics trafficker in his own right who worked in conjunction with other members of the cartel; he held a position of great responsibility in the cartel and participated with its highest leaders in making decisions of central importance.

Harrison demonstrated a relationship between Zuno–Arce and known cartel leaders Rafael Caro–Quintero and Fonseca–Carrillo. Harrison testified to having seen Zuno–Arce at a birthday party given for Caro–Quintero in late 1983, at a house owned by Fonseca–Carrillo. Caro–Quintero was "dancing" some horses when he was approached by Zuno–Arce; Caro–Quintero dismounted and embraced Zuno–Arce. Harrison also testified to seeing Zuno–Arce meet with Fonseca–Carrillo at another house owned by Fonseca–Carrillo sometime thereafter in 1983. Zuno–Arce was led into Fonseca–Carrillo's private office, where they met for approximately 45 minutes.

Godoy–Lopez also established a relationship between Zuno–Arce and other cartel members. He testified about a party at Rancho de la Rosa in August of 1984 held to celebrate Fonseca–Carrillo's marriage. The party was attended by most of the major traffickers, including Caro–Quintero, Fonseca–Carrillo, and Javier Barba–Hernandez. Godoy–Lopez saw Zuno–Arce greeting, talking and otherwise socializing with persons at the party. Godoy–Lopez also testified to being at a January 1985 meeting at the La Langosta restaurant attended by Zuno–Arce, Caro–Quintero, Fonseca–Carrillo, and Barba–Hernandez.

The Government also presented evidence linking Zuno–Arce to drug trafficking. Zuno–Arce was living in Mascota, Jalisco after early 1982. Harrison testified that in December 1983 he escorted, on Fonseca–Carrillo's orders, a stake bed truck loaded heavily and covered with a tarp, from Mascota to Guadalajara. Harrison escorted similar convoys on other occasions and saw later that the trucks were laden with marijuana. Lopez–Romero testified that when he was assigned as a state policeman to the Mascota area in April 1984, he stopped on one occasion a stake bed truck containing approximately 1000 kilograms of marijuana. According to Lopez–Romero, Zuno–Arce arrived in a pickup truck, spoke with the police officer in charge, Eleazar Flores–Torres, and then departed with the marijuana-laden truck without incident. Testimony from Godoy–Lopez further bolstered the link between Zuno–Arce and drug trafficking. Godoy–Lopez testified about traveling to the Mascota area in late August 1984, in the company of ringleader Barba–Hernandez. At a meeting lasting approximately thirty minutes, Barba–Hernandez and others reviewed maps that had been distributed to cartel leaders to coordinate which marijuana fields were to be destroyed, and which would left standing for harvest. Barba–Hernandez and his entourage met with Zuno–Arce in a marijuana field, where the map was given to Zuno–Arce. Zuno–Arce explained that he would check the fields himself and would report back to Fonseca–Carrillo.

The Government further established Zuno–Arce's involvement with the cartel by presenting testimony that he participated in a series of meetings during the fall of 1984 and early 1985, the subject of which was what should be done with the DEA's destruction of the cartel's marijuana fields. One such meeting took place sometime in October 1984 at the Las Americas Hotel in Guadalajara, a hotel owned by cartel member Miguel Angel Felix–Gallardo. Godoy–Lopez was present during some of the discussions, and Lopez–Romero stood guard outside the hotel. Participating in the meeting were most of the major drug traffickers in Guadalajara, including Caro–Quintero, Fonseca–Carrillo,

and Felix–Gallardo. Zuno–Arce also attended and arrived with Miguel Aldana–Ibarra, the head of the Mexican branch of Interpol. Also present were the then-Minister of Gobernacion, Manuel Bartlett–Diaz, the Governor of Jalisco, Enrique Alvarez del Castillo, and the Minister of Defense, Juan Arevalo–Gardoqui.

Godoy–Lopez testified that at the Las Americas meeting, Caro–Quintero and Fonseca–Carrillo asked Aldana–Ibarra "what was going on with the DEA agent, [and] why . . . were [they] losing so many [marijuana] fields." Aldana–Ibarra stated that he had spoken with a DEA agent, but that the agent did not want to strike a deal with the cartel. According to Godoy–Lopez, Zuno–Arce then said "that if the DEA agent didn't want to take anything or didn't want any deal then it was time to drop him." Godoy–Lopez testified that "to drop him" was a euphemism for kidnapping and killing him. Bartlett–Diaz and Alvarez del Castillo each said that a quick solution was necessary to prevent political repercussions should their support of the traffickers be revealed. Godoy–Lopez also overheard Arevalo–Gardoqui add that he would have to continue destroying marijuana fields because of pressure from the United States and the DEA.

Several weeks later, another meeting was held at a residence of Fonseca–Carrillo in Mar–Mara, Guadalajara. Both Godoy–Lopez and Lopez–Romero were present in the house during this meeting. Godoy–Lopez testified that the meeting was attended by Zuno–Arce, Alvarez del Castillo, Caro–Quintero, Fonseca–Carrillo, Barba–Hernandez, and others. During the meeting, Caro–Quintero inquired of Alvarez del Castillo whether the cartel had obtained all of the necessary information regarding the DEA agent. Alvarez del Castillo responded that he was working on it. Lopez–Romero further testified:

> LOPEZ–ROMERO: . . . Ruben Zuno told Caro–Quintero, "There is no problem. Everything is going to come out all right. All

the information [sic], we are doing it correctly."

\* \* \* \* \* \*

> LOPEZ–ROMERO: Rafael Caro–Quintero told Enrique Alvarez del Castillo and to Ruben Zuno, "You had your time with that job. You should have already located the DEA person." Ruben Zuno told Caro–Quintero, "There is no problem. Everything is coming out just fine. Everything is going to be all right."

Sometime later in the fall of 1984, most likely November, a meeting was held at a residence of Barba–Hernandez at 114 Tonala, outside of Guadalajara. Both Godoy–Lopez and Lopez–Romero were present. Godoy–Lopez placed Zuno–Arce, Caro–Quintero, Aldana–Ibarra, Alvarez del Castillo, and Fonseca–Carrillo, among others, at the meeting.

> GODOY–LOPEZ: At that time I heard Rafael Caro–Quintero [say to Aldana–Ibarra], "What is happening with that dick of the DEA?" . . . . I hear Ruben Zuno say, "That fucking Gringo. What is he doing here in Mexico? It's not his fucking country. We have to pick him up."

Alvarez del Castillo argued for a prompt solution. According to Godoy–Lopez, everyone agreed that the DEA agent should be identified and kidnapped.

Some time later, in early December 1984, another meeting was held at another residence of Barba–Hernandez. Godoy–Lopez testified [24] that present at the meeting were Zuno–Arce, Caro–Quintero, Fonseca–Carrillo, Barba–Hernandez, Aldana–Ibarra, and Alvarez del Castillo. Alvarez del Castillo arrived with a sense of urgency and asked Zuno–Arce and others whether they could "handle the fucking Gringo," and that if not, he (Alvarez del Castillo) would have to handle everything. Caro–Quintero responded that they were working on it, and that they had already shot at a DEA car.[25] Zuno–Arce next asked Aldana–Ibarra why he had failed to properly identify and locate the DEA agent at issue; Aldana–Ibarra responded that he was working on it.

---

24. Lopez–Romero was not present at this meeting.

25. This was corroborated by the testimony of a DEA agent who stated that his vehicle had been shot.

In early February 1985, Zuno–Arce attended yet another meeting at a residence of Fonseca–Carrillo on Calle Hidalgo in Guadalajara. Although Lopez–Romero offered no testimony of what was said at the meeting, he did testify that the meeting lasted one and a half to two hours and that it was also attended by Arevalo–Gardoqui, Aldana–Ibarra, Alvarez del Castillo, Caro–Quintero, Felix–Gallardo, Barba–Hernandez, and others.

On February 7, 1985, Camarena was kidnapped and taken to 881 Lope de Vega for interrogation.[26] Lopez–Romero testified[27] that while Camarena was being tortured in another room, an individual named "La Changa" approached Samuel Ramirez–Razo (Fonseca–Carrillo's right-hand man) and told him that Zuno–Arce and other important people wanted to know if Camarena would soon be killed; if so, they wanted to interrogate him beforehand. Ramirez–Razo did not have an answer, and he told La Changa to ask Caro–Quintero. According to Lopez–Romero, he and Fonseca–Carrillo left Lope de Vega in the late afternoon and returned later that evening. Upon their return, Fonseca–Carrillo and others—including Zuno–Arce, Bartlett–Diaz, Arevalo–Gardoqui, Alvarez del Castillo, Caro–Quintero, Felix–Gallardo, and Barba–Hernandez—met in the living room of the Lope de Vega residence. Lopez–Romero overheard Zuno–Arce say: "The way that we had told you guys that the DEA was going to get rid of the drug trafficker in Jalisco, we wanted you to hear it from his [the DEA agent's] mouth." Arevalo–Gardoqui later said that he wanted the bodies to be properly buried, hidden where they could not be found. Lopez–Romero also testified that Bartlett–Diaz remarked to Caro–Quintero: "Just the same way that this problem was resolved, we're going to resolve all the others and there's not going to be any problems." Caro–Quintero replied that Bartlett–Diaz should not worry,

"you're going to go as far as we want you to. We need you up there. Just tell us what you need and we'll give it to you." The Court admitted two tape recordings of the interrogation of Camarena, in which Caro–Quintero's voice was identified as one of the interrogators.

The Government also presented evidence connecting Zuno–Arce to the property where Camarena was held and tortured. According to Zuno–Arce's own testimony, he had owned the house at 881 Lope de Vega for years. A couple of weeks before the February 7, 1985 kidnapping, Zuno–Arce sold the house to someone else, Ruben Sanchez–Barba. Documentary evidence was presented suggesting that the sale was a sham to distance Zuno–Arce from cartel activities. In fact, the sale actually did not become final until June 1985, months after the kidnapping and murder of Camarena and his pilot. Ultimately, the property fell into the hands of Caro–Quintero. Harrison bolstered the connection between Zuno–Arce and Caro–Quintero by testifying that in early 1984, before Zuno–Arce purportedly sold the residence, Caro–Quintero had also taken up residence at 881 Lope de Vega.[28]

Because much of the Government's case was based on the testimony of Godoy–Lopez and Lopez–Romero, it is important to review at this time the lengths Zuno–Arce's trial counsel[29] went to impeach the credibility of these witnesses. The jury heard the following: Both witnesses were inexplicably silent for seven years and absent during *Zuno I*, they had only now appeared to testify at *Zuno II*. Despite multiple meetings with the DEA in August, September and October, 1991, Godoy–Lopez did not mention Zuno–Arce or the kidnapping meetings until eight months later in mid-April 1992. Lopez–Romero first met with the DEA in March 1992, but also did not disclose any informa-

26. Forensic evidence and the testimony of Lopez–Romero established that prior to being murdered, Camarena and his pilot Zavala–Avelar were held at 881 Lope de Vega.

27. Godoy–Lopez was not present at this meeting.

28. No forensic evidence—such as hair samples or finger prints—was obtained tying Zuno–Arce

to 881 Lope de Vega. The Government presented evidence, however, that Mexican officials obstructed the investigation at Lope de Vega, making evidence gathering extremely difficult.

29. The Government on its own initiative disclosed some of this impeachment evidence to the jury.

tion of the conspiracy meetings until mid-April 1992. Counsel made special note that both witnesses came forward with the new information almost simultaneously.

With regard to Godoy–Lopez in particular, the jury heard the following: He was a bodyguard and bagman to drug lord Fonseca–Carrillo. He was dismissed from his state police officer position in July 1984. He was arrested in Mexico along with Fonseca–Carrillo in April 1985 and charged with carrying guns, associating with criminal activity, and importing prohibited weapons. He was arrested again in Mexico in July 1991 for robbing a bank and spent some time in jail. He assisted Fonseca–Carrillo in bribing public officials. He had a back injury when some of the kidnapping meetings allegedly occurred and thus he could not have attended them as he claims he did. In a confession to Mexican officials following the crime, he failed to mention any knowledge of the kidnapping meetings or make reference to Zuno–Arce. And finally, he received immunity, a $3,000 tax-free monthly stipend from the Government for an indeterminate period (more money than he had ever made), relocation to the United States, and an Immigration and Naturalization Service (INS) work permit.

With regard to Lopez–Romero in particular, the jury heard the following: He was a bodyguard for cartel leader Fonseca–Carrillo and admitted that he would kill another person if ordered to do so by Fonseca–Carrillo. He admitted and described his participation in the actual kidnapping of Camarena from near the United States Consulate in Guadalajara. He participated in the kidnapping, torture, and murder of four Jehovah Witnesses and an American couple, a matter which was the subject of another trial; he further admitted to suggesting that some of the victims should be shot so that they would not suffer. While serving as a Jalisco police officer, he took a bribe from someone whose weapon he had confiscated. He was discharged from the state police force in 1984 following a

shooting incident involving his partner; he was also charged with obstruction of justice in that case. And finally, he received immunity, a $3,000 tax-free monthly stipend for an indeterminate period, relocation to the United States, and an INS work permit.

### B

Zuno–Arce offers additional facts which, he argues, would more likely than not persuade every juror sitting on a panel of twelve to vote to acquit him of any involvement in the crimes for which he was indicted.

The new impeachment evidence with regard to Godoy–Lopez is as follows: Godoy–Lopez had covered up his involvement in a series of 1991 robberies in Mexico by committing and suborning perjury. He had a reputation in his home town for being dishonest and untrustworthy. His testimony at *Zuno II* was inconsistent with statements he gave under oath in a Mexican court; specifically, he had asserted in the 1986 Mexican case that he was not in any way involved with drug traffickers and that until taken into custody he had not known Caro–Quintero or Fonseca–Carrillo.[30] His testimony that he accompanied Fonseca–Carrillo by plane to a military landing strip at the "number one military camp" in the "southern area of Mexico City" to deliver money from the cartel to the Minister of Defense Arevalo–Gardoqui is contradicted by the fact the landing strip he described could not have accommodated the plane he claims to have arrived in. His testimony that he went to a Mexican bank to withdraw thousands of dollars in American currency on behalf of Fonseca–Carrillo is contradicted by the fact that no Mexican bank could have satisfied such a withdrawal. And finally, his testimony that Bartlett–Diaz was present at 881 Lope de Vega on the evening of February 7, 1985 is contradicted by the fact that Bartlett–Diaz was in Mexico City at that time.[31] The Court assumes this all to be true for purposes of this portion of the motion.[32]

**30.** *See* Exhibits MM & NN *in* Declaration of John Brown and Exhibits in Support of Motion for New Trial.

**31.** *See* Jose Luis Morfin–Patraca & Manuel Morato–Cruz Declarations *in* Declaration of John Brown and Exhibits in Support of Motion for New Trial.

**32.** Zuno–Arce also alleges that Godoy–Lopez was promised before or during *Zuno II* more money than the Government disclosed at trial. Although

The new impeachment evidence with regard to Lopez–Romero is as follows: He covered up his involvement in a 1984 murder in Mexico by committing and suborning perjury. On November 23, 1992, one week before *Zuno II* started, Lopez–Romero was arrested in Moreno Valley, California for spousal abuse. The Government interceded with local authorities on his behalf, sought and obtained a dismissal of the charges. He lied to local authorities when arrested on the abuse charge; specifically, he told officers that his wife "hits herself," that there were no cases, warrants, or holds pending against him, and that he had never been arrested before. And finally, his testimony that Bartlett–Diaz was present at 881 Lope de Vega in the evening on February 7, 1985 is contradicted by the fact that Bartlett–Diaz was in Mexico City at that time.[33] The Court assumes this all to be true for purposes of this portion of the motion.

Zuno–Arce also argues that evidence from a previously-redacted September 17, 1992 DEA-6 report re: Ramon Lira (an informant and former bodyguard to Fonseca–Carrillo) establishes that both Godoy–Lopez and Lopez–Romero lied when they testified that the subject matter at meetings in late 1984 concerned identifying what DEA agent was responsible for the cartel's substantial losses. The redacted portions of the report recount Ramon Lira's description of a meeting held at a house owned by Fonseca–Carrillo. *See* Exhibit O *in* Appendix of Exhibits Filed in Support of Government's Opposition to Defendant's Motion for New Trial (CR docket # 2195). Lira accompanied Fonseca–Carrillo to the house sometime in November 1984, and waited while Fonseca–Carrillo spent about an hour in one of the offices. Thinking that Fonseca–Carrillo might have left, Lira looked into the room and saw seated around the table Fonseca–Carrillo, Miguel de la Madrid (then-President of Mexico),

Jose Lopez–Portillo (a past president of Mexico), and Alvarez del Castillo. In front of Alvarez del Castillo was a stack of United States currency. Lira heard the words "bufalo" and "Camarena" while looking into the room, which he did for only fifteen to twenty seconds. Zuno–Arce argues that the redacted portions of the report demonstrate that Fonseca–Carrillo and others knew already in November 1984 that Camarena was responsible for the cartel's losses. The implication here is that if Godoy–Lopez and Lopez–Romero were mistaken about what was said at these meetings, then they also probably testified untruthfully about the other meetings. Because the DEA-6 report's reference to "Camarena" and "bufalo" are without any context this evidence is of little probative value. Lira's statement provides little more than evidence that Fonseca–Carrillo and others *may* have already known in November 1984 that Camarena was responsible for the raid at "El Bufalo." The information does not, however, refute testimony regarding meetings occurring prior to November 1984. When coupled with all the other impeachment evidence presented during *Zuno II*, this information becomes inconsequential. Zuno–Arce's counsel had already argued at the trial that the conspirators already knew Camarena's identity before some of the meetings described by Godoy–Lopez, and that Godoy–Lopez's testimony must have thus been false. The jury rejected that position. Moreover, had Zuno–Arce called Lira to the stand during *Zuno II* to further explicate what was heard in November 1984, the Government would have likely elicited testimony from Lira which *further implicated* Zuno–Arce. Lira's other DEA-6 reports reflect that Lira had seen Zuno–Arce meeting with cartel members Caro–Quintero, Fonseca–Carrillo, Barba–Hernandez, Matta–Ballesteros, and Felix–Gallardo, among others, in January and February 1985, *see* Exhibit U

it is undisputed that Godoy–Lopez did receive a lump sum payment of $100,000 from the Government in late 1995, Zuno–Arce has presented no evidence to indicate, or to even warrant an evidentiary hearing, that the Government had promised this money to Godoy–Lopez either before or during *Zuno II*. Rather, it appears from the record that the decision to pay Godoy–Lopez the $100,000 lump sum came after *Zuno II;*

specifically, the Government had decided to cease his monthly subsistence payments.

33. Zuno–Arce also alleges that Lopez–Romero was promised before or during *Zuno II* more money than the Government disclosed at trial. For the same reasons noted *supra*, in footnote 32, the Court rejects this contention.

*in* Appendix of Exhibits Filed in Support of Opposition to Motion for New Trial, that Lira had seen Zuno–Arce on February 6 & 7, 1985 at 881 Lope de Vega, *see* Exhibit V *in* Appendix of Exhibits Filed in Support of Opposition to Motion for New Trial, and that Lira had seen Zuno–Arce and others later discuss what should be done with the bodies of Camarena and his pilot, *see id.* Thus, presenting Lira to the jury would have done more harm than good to Zuno–Arce's cause.

Zuno–Arce also argues that Cervantes–Santos's declaration that he lied at *Zuno I* demonstrates that Godoy–Lopez and Lopez–Romero lied during *Zuno II.* Paragraph 21 of Cervantes–Santos's declaration, according to Zuno–Arce, "speaks volumes and cannot be understated." Motion for New Trial 24. It would be more accurate to say that the declaration speaks for itself:

> [While] waiting at the courthouse for my turn to testify [in *Zuno II* ], Medrano and Berrellez ... introduced [me to] Jorge Godoy Lopez and Rene Lopez Romero [two men I had never seen before]. Berrellez told me that both Godoy as well as Lopez had known me in La Quinta. I answered (in the presence of Godoy and Lopez) that I had never known either one of the two. Medrano told me that I should try hard to remember, because I had seen them on several occasions and they knew me. Then I understood that the prosecutor Medrano was asking that I testify falsely that I had seen Godoy and Lopez at meetings at La Quinta on different occasions although I had never seen them.

Cervantes–Santos Declaration ¶ 21, Exhibit B *in* Appendix of Exhibits Filed in Support of Opposition to Motion for New Trial. Ultimately, Cervantes–Santos was never called to testify in *Zuno II.* No where does the declaration suggest that Godoy–Lopez and Lopez–Romero were going to lie or did lie at the second trial. Nevertheless, Zuno–Arce has extrapolated from this paragraph that Medrano and Berrellez directed Cervantes–Santos to coordinate the testimony of Godoy–Lopez and Lopez–Romero with his own. To be sure, it would appear that Cervantes–Santos was to lie at trial, but nothing in that paragraph indicates that Godoy–Lopez and Lopez–Romero were to change their testimony. There are no declarations from Godoy–Lopez or Lopez–Romero in which they recant.

On a somewhat related note, Zuno–Arce argues that Cervantes–Santos's declaration provides evidence regarding the kidnapping meetings that is inconsistent with the evidence presented by Godoy–Lopez and Lopez–Romero, making the latter two liars. *See* Motion for New Trial 22–24. The theory supporting the argument is somewhat complicated and bears recounting in detail. At both *Zuno I* and *Zuno II* the Government's evidence established that Zuno–Arce attended and spoke at several meetings during which the cartel planned the kidnapping and murder of Camarena. Cervantes–Santos provided the testimony in the first trial, while Godoy–Lopez and Lopez–Romero provided the testimony in the second. The basic premise of Zuno–Arce's argument is that Cervantes–Santos, Godoy–Lopez, and Lopez–Romero's testimony regarding the time and place of the meetings were all consistent. And because Cervantes–Santos has now recanted his testimony and has stated that some of these meetings never took place, Zuno–Arce argues that Godoy–Lopez and Lopez–Romero must have lied at *Zuno II.* In other words, if Cervantes–Santos committed perjury at *Zuno I,* so did Godoy–Lopez and Lopez–Romero because they testified to facts that were consistent with those to which Cervantes–Santos testified. The premise of the syllogism is faulty, however. The Court's recollection is that the testimony in the two trials regarding these meetings was in fact inconsistent. The Court of Appeals reached the same conclusion. *See United States v. Zuno–Arce,* 44 F.3d 1420, 1422–23 (9th Cir.) ("Godoy–Lopez and Lopez–Romero put the meetings at different times and places from Cervantes–Santos, with different people present."), *cert. denied,* 516 U.S. 945, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995). Thus, Cervantes–Santos's purported switch of testimony does not necessarily reflect that Godoy–Lopez and Lopez–Romero had lied at *Zuno II.*

Zuno–Arce next argues that the meeting at Las Americas Hotel (which Zuno–Arce at-

tended) could not have occurred because the hotel had no "suites" which could comfortably accommodate the number of persons said to have been at the meeting by Lopez–Romero—approximately thirty people. The source for this evidence is John Brown, a private investigator serving the defense. *See* Declaration of John Brown and Exhibits in Support of Motion for New Trial ¶ 7 ("I was shown by hotel personnel each of the suites in the hotel. All of the suites were small. None of them would be large enough to hold thirty people at one time in a comfortable manner."). This new evidence is both unreliable and insufficient. The Court first notes that the evidence pertaining to the size of hotel rooms in the Las Americas Hotel lacks sufficient indicia of reliability to support its probable accuracy. Brown's conclusory, and in a sense self-serving, allegations are not corroborated by reliable physical evidence. *See id.* ¶ 7. The photographs submitted as Exhibit RRR, *see id.*, are either irrelevant or inconclusive. Photos of the outside of the hotel do not in any way buttress Brown's statements regarding the size of the rooms. The single photograph of the interior of a "suite" is not clearly reproduced and, in any event, due to the angle and distance of the camera, does not accurately reflect the exact size of the room. *See* Hampton Dellinger, *Words are Enough: The Troublesome Use of Photographs, Maps, and Other Images in Supreme Court Opinions*, 110 Harv.L.Rev. 1704, 1716 (1997) ("[The] partisan perspective and lack of clarity reveal the extent to which photographs are subjective representations of a scene, rather than literal transcriptions of an objective visual reality."). Moreover, every photograph submitted was taken in 1994, ten years after the meeting at Las Americas Hotel actually took place. Zuno–Arce has presented no evidence to demonstrate that the hotel is presently in the same state as it was in 1984, *i.e.*, that it has never undergone remodeling. Moreover, even if the Court were to assume the reliability of this evidence, the new evidence is not inconsistent with that which was presented at trial. In arguing that the room is too small to hold thirty persons, Zuno–Arce relies on the testimony of Lopez–Romero, who at that meeting had stood guard outside the hotel.

Lopez–Romero testified that approximately thirty people exited the hotel, but he did not testify that all thirty people were in a single suite, nor could he because he did not enter the hotel. Godoy–Lopez, who was in the suite, testified that approximately seventeen different persons were at one time or another in the suite. He did not testify, however, that all seventeen were in the room at the same time. Moreover, Zuno–Arce has not presented evidence that the suite could not hold seventeen people comfortably or otherwise. Finally, Brown's photograph of the single room fails to account for Godoy–Lopez's testimony that the suite may have indeed comprised two adjoining hotel rooms.

The defendant next argues that he could not have been involved in the April 1984 drug stop described by Lopez–Romero in which Zuno–Arce supposedly pulled up in a pickup truck and left with a drug-laden stake bed truck. *See id.* ¶ 8 ("On September 14, 1994, I met with Eleazar Flores–Torres[, Lopez–Romero's supervisor in the Jalisco state police,] in Guadalajara, Mexico. At that time [he] told me ... that no such incident had ever occurred. Flores stated that state judicial police did not normally participate in narcotics investigations, because that type of criminal activity was within the exclusive jurisdiction of the federal authorities."). This second piece of material contradictory evidence is also defective. The source for this evidence again is John Brown, who claims to have heard from Lopez–Romero's supervisor Eleazar Flores–Torres that no such incident ever occurred. This hearsay evidence may be deemed reliable if the statements are corroborated by physical evidence or other witness testimony. *See United States v. Petty*, 982 F.2d 1365, 1367 (9th Cir.1993) (discussing permissible use of hearsay at sentencing so long as reliable), *amended* 992 F.2d 1015, *and cert. denied*, 510 U.S. 1040, 114 S.Ct. 683, 126 L.Ed.2d 650 (1994). There is no declaration from Flores–Torres or any other witness, nor is there any physical evidence proving that Zuno–Arce was not present. With no minimal indicia of reliability to accompany this hearsay statement, the Court finds the evidence outside the scope of the *Schlup* rule.

C

 The instant motion has not made a satisfactory showing of actual innocence. The new reliable evidence serves only to impeach the credibility of Godoy–Lopez and Lopez–Romero. "[I]mpeachment evidence provides [little] basis for finding a miscarriage of justice." *Thompson,* —— U.S. at ——, 118 S.Ct. at 1504. This follows because "the evidence is a step removed from evidence pertaining to the crime itself." *Id.* To find that this impeachment evidence in all probability would have altered the outcome of Zuno–Arce's trial, the Court would have to assume that the jury accepted Godoy–Lopez and Lopez–Romero's *Zuno II* testimony without a hint of reservation. *See id.* This was clearly not the case. The jury received substantial impeachment evidence pertaining to Godoy–Lopez and Lopez–Romero. The Court would improperly disrespect the jurors if it were to find that, had they been presented with still more impeachment evidence of the same nature, they would have reached a different verdict. *See id.* at 1505; *United States v. Wong,* 78 F.3d 73, 82 (2d Cir.1996) (cumulative impeachment evidence insufficient to warrant new trial even under more lenient standard). The new evidence merely confirms what was already known to the jury during *Zuno II* —that Godoy–Lopez and Lopez–Romero were no angels. Moreover, it is important to note that none of the new impeachment evidence directly calls into question either witnesses's testimony regarding Zuno–Arce's participation in the kidnapping and murder of Camarena. For instance, evidence regarding the landing strip at the "number one military camp" and bank withdrawals was irrelevant to the kidnapping charges and the RICO claims. Even the evidence most related to Zuno–Arce, the purportedly false testimony that Bartlett–Diaz attended a meeting where Zuno–Arce was also alleged to have been present, adds only very limited support to Zuno–Arce's position.

Finally, the Court notes that Zuno–Arce has not presented any evidence of the type identified in *Schlup* as reliable "actual innocence" evidence—"whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup,* 513 U.S. at 324, 115 S.Ct. at 865; *see*

*also Thompson,* —— U.S. at ——, 118 S.Ct. at 1505 (discussing scientific evidence). Neither Godoy–Lopez nor Lopez–Romero have recanted their own eyewitness testimony, no new persons claiming to have witnessed the meetings or the torture and interrogation have surfaced, and no physical or forensic evidence placing Zuno–Arce elsewhere during these meetings or otherwise exculpating him has been presented. Even assuming that Zuno–Arce's trial was not error free, the tangential evidence distancing Zuno–Arce from the kidnapping and murder of Camarena does not constitute sufficient "new reliable evidence" to destroy the Court's confidence in the outcome of the trial. The new evidence is certainly not so strong as to place Zuno–Arce in that narrow class of cases in which it is more likely than not that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. *See Schlup,* 513 U.S. at 329, 115 S.Ct. at 868.

V

 Having determined that Zuno–Arce has failed to satisfy the *Schlup* standard, the Court next considers what evidence, pursuant to the one-year period of limitations found in 28 U.S.C. § 2255(4), must be barred from consideration. The Court finds that the following evidence (set forth below) could have been discovered through the exercise of due diligence (or was actually discovered) before October 30, 1996, and the Court accordingly DISMISSES with prejudice those claims of the motion which rely on those facts.

*Materials Related to Godoy–Lopez and Lopez–Romero Generally:* In January 1995, the Government forwarded to Zuno–Arce's counsel, Edward Medvene, a copy of a draft report that had been prepared by Michael Lightfoot, one of Manuel Bartlett–Diaz's attorneys. *See* Declaration of Edward M. Medvene ¶ 3 *in* Reply to Government's Opposition to: Petitioner's Response to Order to Show Cause (admitting he received the report). The draft report discloses much of what Zuno–Arce raises as evidence in support of his *Brady–Bagley* claim, namely the

background and activities of Godoy–Lopez and Lopez–Romero. *See* Exhibit GG *in* Appendix of Exhibits Filed in Support of Government's Opposition to Defendant's Motion for New Trial. The report recounts in detail how:

—Godoy–Lopez and Lopez–Romero must have lied about the meeting at the Las Americas Hotel in Guadalajara, Mexico because not one of the suites is large enough to hold the purported thirty or so people who attended

—Godoy–Lopez and Lopez–Romero must have lied about Bartlett–Diaz being present at a meeting at 881 Lope de Vega in Guadalajara on February 7, 1985 because Bartlett–Diaz was in Mexico City during that time

—Godoy–Lopez and Lopez–Romero have reputations for dishonesty and a history of committing perjury

—Godoy–Lopez and Lopez–Romero participated in the torture and murder of persons in Mexico

—Godoy–Lopez orchestrated the cover-up of four armed robberies

—Lopez–Romero orchestrated the cover-up of his own involvement in an officer-related shooting incident in which one man was killed and another was seriously injured

*Materials Related to Lopez–Romero's 1992 Arrest for Spousal Abuse:* Although the draft report did not contain any reference to Lopez–Romero's arrest for spousal abuse, a subsequent final report created by Lightfoot and others in October 1995 did refer to the arrest. Specifically, the final report included various records from the case file such as the arrest report, the fact that Lopez–Romero was released to the custody of Agent Berrellez, and information concerning the ultimate dismissal of the charges. Although Zuno–Arce's counsel has no recollection of having any knowledge of Lopez–Romero's arrest prior to October 30, 1996, he does not deny

ever receiving the final October 1995 report. *See* Declaration of Edward M. Medvene ¶ 5 *in* Reply to Government's Opposition to: Petitioner's Response to Order to Show Cause.

The evidence in fact militates towards a finding that Medvene did receive the final report. Lightfoot had previously sent exhibits to the draft report to Medvene, in part, because of an understanding between Medvene, Lightfoot, and the Government that such materials should be forwarded to Medvene. *See* Exhibit HH *in* Appendix of Exhibits Filed in Support of Government's Opposition to Defendant's Motion for New Trial. There is no evidence to indicate that this was to be a single transaction or single swapping of information; rather, common sense would dictate that this was a continuing responsibility, to terminate only upon completion of the final report. This is bolstered by the fact that Medvene and Lightfoot had interests that were similarly aligned, both sought information to discredit Godoy–Lopez and Lopez–Romero. Thus, Zuno–Arce's counsel could have, through the exercise of due diligence, discovered Lopez–Romero's 1992 arrest prior to October 30, 1996. Moreover, the documents contained in the October 1995 final report would have led a diligent attorney to discover the letter of Agent Berrellez to the state prosecutor in which Berrellez implicitly requested a dismissal of the case. Similarly, a diligent attorney would have discovered that Lopez–Romero made false statements to the police when he was arrested for spousal abuse. Much as Zuno–Arce had a private investigator speak with the state prosecutor in October of 1997, when the letter was ultimately discovered, he could have done the same at some time before October 1996.

*Materials Related to the Landing Strip at the "Number One Military Camp" Near Mexico City:* Also not properly before the Court is the evidence which Zuno–Arce claims contradicts Godoy–Lopez's *Zuno II* testimony that he flew via personal jet with

others to a military base—the "number one military camp" in the "southern area of Mexico City"—to deliver money from the cartel to the Minister of Defense Arevalo–Gardoqui. Zuno–Arce has submitted a declaration from a Mexican general, dated October 27, 1997, which states that for twenty-five years there has not been a military landing strip, at what he calls "Military Camp No. 1–A," capable of accommodating the personal jet Godoy–Lopez claims to have arrived in. *See* Exhibit 8 *in* Accompanying Declarations and Exhibits for Notice of Motion and Motion for New Trial. This information, however, could have been discovered through the exercise of reasonable diligence before October 30, 1996. Zuno–Arce was on notice of Godoy–Lopez's testimony on this matter in 1992, and he has failed to explain, as he was ordered to do by this Court's March 30, 1998 Order,[34] why he could not have obtained such a declaration before October 1996.

*Materials Related to Godoy–Lopez's Withdrawal of U.S. Funds from a Mexican Bank:* Similarly, the Court will not consider evidence which contradicts Godoy–Lopez's *Zuno II* testimony that he withdrew, on behalf of Fonseca–Carrillo, "suitcases" of U.S. dollars from a Mexican bank which were to be delivered to Alvarez del Castillo. Zuno–Arce has submitted a letter from a representative of the Bank of Mexico, dated October 28, 1997, in which the representative states that no Mexican bank could, at that time, accommodate such a request for a large sum of U.S. dollars. *See* Exhibit K *in* Declaration of John Brown and Exhibits in Support of Motion for New Trial. As before, however, this information could have been discovered through the exercise of reasonable diligence before October 30, 1996. Zuno–Arce was on notice of Godoy–Lopez's testimony on this matter in 1992, and he has failed to explain, as he was ordered to do by this Court's March 30, 1998 Order, why he could not have obtained such information before October 1996.

*Materials Related to Zuno–Arce's Involvement in the April 1984 Drug Stop as De-scribed by Lopez–Romero:* The evidence submitted to refute Zuno–Arce's presence during an April 1984 drug stop is also not properly before the Court. *See id.* ¶ 8 ("On September 14, 1994, I met with Eleazar Flores–Torres[, Lopez–Romero's supervisor in the Jalisco state police,] in Guadalajara, Mexico. At that time [he] told me ... that no such incident had ever occurred. Flores stated that state judicial police did not normally participate in narcotics investigations, because that type of criminal activity was within the exclusive jurisdiction of the federal authorities."). First of all, John Brown, the private investigator hired by Lightfoot on behalf of Bartlett–Diaz, actually discovered this evidence in September 1994. *See id.* ¶ 8. The Court assumes, because of the open communication line between Lightfoot and Zuno–Arce's counsel, that such information was actually in the possession of Zuno–Arce's counsel shortly thereafter. Second, and in the alternative, this evidence is of the type that Zuno–Arce's counsel could have discovered through their own exercise of reasonable diligence. Lopez–Romero's testimony on the April 1984 drug stop was an important piece of evidence, for it directly linked Zuno–Arce to drug trafficking. Much as investigator Brown found information to refute that testimony in 1994, Zuno–Arce's counsel could have done the same sometime before October 30, 1996. Having failed to account for his failure to exercise reasonable diligence, this evidence may not go forward.

*Materials Related to Statements made by Godoy–Lopez to Mexican Authorities and Other Evidence Found in the Case Files of Mexican Authorities:* Finally, Zuno–Arce has also set forth evidence obtained from Mexican proceedings which he believes contradicts some of Godoy–Lopez and Lopez–Romero's testimony in *Zuno II*. The information includes among other things statements made by Godoy–Lopez regarding his relationships with cartel members and his involvement in the kidnapping and murder of Camarena. This information could have been discovered through the exercise of reasonable diligence. John Brown actually

---

34. "[F]or Zuno–Arce's § 2255 motion to go forward, he must demonstrate to the Court's satisfaction that the facts supporting his claims could not have been discovered through the exercise of due diligence before October 30, 1996." Order dated March 30, 1998 (CR docket # 2226).

obtained all of this information himself in January and February 1995. *See id.* ¶ 4. Information in Brown's possession would be imputed, for the reasons set forth above, to Zuno–Arce's counsel. In any event, even if Zuno–Arce did not actually possess this information, he could have obtained it through his own investigation well before October 1996. Zuno–Arce has failed to offer even a single explanation why these facts in support of his claims were undiscoverable through reasonable diligence before October 30, 1996.

## VI

The Court now addresses Zuno–Arce's remaining constitutional claims. Zuno–Arce first argues that the use of Cervantes–Santos's perjured testimony in *Zuno I* precluded Zuno–Arce's retrial in *Zuno II* under the Double Jeopardy Clause: "Mr. Zuno's second trial was barred by the Double Jeopardy Clause because the government's misconduct during the first trial when it knowingly and intentionally used the false testimony of Cervantes[–Santos] was intended to prevent acquittal that the government believed at the time was likely to occur in the absence of that misconduct." Reply to Government's Opposition to Petitioner's Response to Order to Show Cause 20 (CR docket # 2238). The claim fails for two reasons.

## A

First, this claim is not properly before the Court. As with the claim for ineffective assistance of counsel, this claim was belatedly added to Zuno–Arce's § 2255 motion without the Court's permission. Moreover, the argument supporting the claim has only been fully set forth in the defendant's Comprehensive Reply, *see* CR docket # 2253, leaving the Government no opportunity to respond. Zuno–Arce had no right to amend his motion without leave of the Court, and the Court need not consider this new claim.

## B

 Second, such a separate and distinct constitutional claim is not cognizable in this case as a matter of law.

The Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense.... [Ordinarily,] if a defendant requests a mistrial, he gives up his right to a verdict by the jury then empaneled, and double jeopardy does not bar his retrial.

*United States v. Doyle,* 121 F.3d 1078, 1083–84 (7th Cir.1997) (citations and internal quotation marks omitted).

 The Supreme Court has created a limited exception to the "motion for mistrial" rule. *See Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982) (narrowing *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976)). The Court held that the Double Jeopardy Clause bars retrial in the limited situation where the Government engages in prosecutorial misconduct *"intended* to provoke the defendant into moving for a mistrial," *Kennedy,* 456 U.S. at 679, 102 S.Ct. at 2091 (emphasis added); that is to say, where the prosecutor *overtly* "goads" the defense into moving for a mistrial. The rule was designed to hinder a prosecutor's ability to scuttle a case that he knows will lead to an acquittal. Thus, the rule as currently recognized by the Supreme Court prevents *overt* actions by a prosecutor during trial (usually improper reference to evidence or comments during closing argument) that he knows will trigger a competent attorney to move for a mistrial. The focus here is on the prosecutor's intent to "abort the trial," thus "[t]he only relevant intent is *intent to terminate the trial,* not intent to prevail at this trial by impermissible means." *United States v. Doyle,* 121 F.3d 1078, 1086 (7th Cir.1997) (emphasis added); *see also United States v. Jozwiak,* 954 F.2d 458, 460 (7th Cir.) ("*Kennedy* distinguishes intent to improve the chance that the trier of fact will return a favorable decision from the forbidden intent to *avoid* decision by the trier of fact."), *cert. denied,* 503 U.S. 950, 112 S.Ct. 1512, 117 L.Ed.2d 649 (1992). Zuno–Arce's argument focuses on the *covert* impropriety of a prosecutor, namely, in our case, that AUSA Medrano suborned Cervantes–San-

tos's perjury in *Zuno I*.[35] The Court is of the opinion that Zuno–Arce's allegations, taken as true, do not state a claim for which relief can be granted under the Double Jeopardy Clause.

 As a preliminary matter, the Court first notes that no motion for a mistrial was sought or granted in *Zuno I*, placing this matter outside the scope of *Kennedy*. Any attempt to characterize the Court's order setting aside the jury verdict and granting a new trial as a functional equivalent of a mistrial is mistaken. As the Tenth Circuit Court of Appeals has persuasively concluded:

> Defendants' reliance on *Kennedy* is misplaced . . . because no mistrial was declared in this case. The district court never granted Defendants' motions for a mistrial. The case proceeded to the jury and guilty verdicts were returned. Defendants did not obtain a mistrial, but instead succeeded in having the district court set aside the guilty verdicts. Although Defendants attempt to characterize the district court's order setting aside the jury verdicts and granting a new trial as the functional equivalent of a mistrial, Defendants miss a crucial distinction. The *Kennedy* prosecutorial misconduct exception is a narrow one, designed to protect the defendant's right to "have his trial completed before the first jury empaneled to try him." *Kennedy*, 456 U.S. at 673, 102 S.Ct. at 2088. Without this exception a prosecutor could intentionally provoke a defendant into requesting a mistrial and the defendant would then be prevented from later invoking a double jeopardy bar to his retrial. Such a result would render a defendant's "valued right to complete his trial before the first jury" a "hollow shell." *Id.* Defendants, however, do not require such protection because without the declaration of a mistrial, they were not deprived of their "valued right" to have their case submitted to the first jury, and perhaps have the dispute end with an acquittal. For these reasons, we conclude

that the mistrial exception for prosecutorial misconduct set forth in *Kennedy* simply does not apply to Defendants.

*United States v. McAleer*, 138 F.3d 852, 856 (10th Cir.1998). The Court agrees with the Tenth Circuit's conclusion and reaches the same conclusion with respect to Zuno–Arce's claim.

Even if the Court were to equate Zuno–Arce's motion for a new trial to a motion for a mistrial, or assume that neither motion was necessary, the argument that covert misconduct applies within the *Kennedy* rule is also mistaken.

The Court agrees with the Seventh Circuit Court of Appeals' statement in *United States v. Doyle*:

> [The defendant] believes that it is highly significant that the alleged prosecutorial misconduct in this case was undertaken covertly; he could not have known about the misconduct in order to make the requisite motion for a mistrial. This is, of course, a sticking point. Since [the defendant] did not know at trial that the prosecution was engaging in any possible misconduct, any such misconduct could not possibly have been designed to goad him into moving for a mistrial, or intended to abort the trial. . . . Rather, [the defendant] and his co-defendants proceeded through trial to a verdict. . . . [I]f this misconduct did occur, it more likely was undertaken with the intent to *win* at trial—not to force a second go-around in a complicated, expensive, lengthy and resource-depleting trial.

121 F.3d at 1086–87. The Eighth Circuit Court of Appeals has reached a similar conclusion:

> [Defendant's] position is that the Double Jeopardy Clause should bar retrial whenever a reversal [ (or in our case granting a motion for a new trial) ] can *later* be attributed to "prosecutorial misconduct," indeed, whenever a defendant can prove prosecutorial misconduct after a conviction was reversed for *any* reason. We reject

---

**35.** Although the prosecution clearly engaged in *overt* misconduct in *Zuno I, i.e.,* the improper comments during closing argument, *see United States v. Zuno–Arce,* 958 F.2d 380, 1992 WL 59017 (9th Cir.1992), Zuno–Arce does not use the overt action as a basis for his present double jeopardy claim.

that contention, which has no support in any prior double jeopardy decision.

*Jacob v. Clarke,* 52 F.3d 178, 181 (8th Cir.), *cert. denied,* 516 U.S. 924, 116 S.Ct. 323, 133 L.Ed.2d 224 (1995).

In adopting the reasoning of the Tenth, Seventh, and Eighth Circuits on this issue, the Court rejects the position taken by the Second Circuit Court of Appeals in *United States v. Wallach,* 979 F.2d 912 (2d Cir.1992), *cert. denied,* 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993), as an over expansive and impermissible extension of *Kennedy.* The Court concludes that a remedy for the sort of misconduct alleged by Zuno–Arce cannot be found in the Double Jeopardy Clause.[36]

## VII

Zuno–Arce's two remaining claims are closely related, for they both contend that the Government withheld material information or evidence from the defense in violation of the Due Process Clause of the Fifth Amendment. Zuno–Arce's first claim is that the Government knowingly used false evidence (and failed to disclose as much) during *Zuno II,* namely the purportedly perjured testimony of Godoy–Lopez and Lopez–Romero. The claim finds its roots in *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) and *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (the "*Mooney–Napue* claim"). Zuno–Arce's second claim alleges that the Government failed to disclose other exculpatory and impeachment evidence, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (the "*Brady–Bagley* claim"). The Court below describes the individual elements necessary to succeed on each claim and then observes and more fully explains how the two claims operate in combination.

To establish a constitutional error in violation of *Mooney–Napue,* a movant must demonstrate that (1) the testimony (or evidence) was actually false; (2) the prosecution knew or should have known[37] that the

---

**36.** Allegations of covert misconduct discovered before retrial will not, however, leave a defendant without a remedy; such behavior might require dismissal of the case with prejudice pursuant to a court's supervisory powers, *see United States v. Hasting,* 461 U.S. 499, 505–07, 103 S.Ct. 1974, 1978–79, 76 L.Ed.2d 96 (1983); *United States v. Kojayan,* 8 F.3d 1315, 1325 (9th Cir. 1993); *United States v. Simpson,* 927 F.2d 1088, 1090–91 (9th Cir.1991), or may constitute a violation the Due Process Clause of the Fifth or Fourteenth Amendments, *see Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

**37.** The Supreme Court has on at least two occasions indicated that this test is equally applicable where the prosecutor "should have known" that testimony was false. *See United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (first instance of statement); *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) (repeating the statement found in *Agurs* ). Numerous decisions in our circuit and others have quoted the language found in *Agurs. See, e.g., United States v. Slaughter,* 128 F.3d 623, 630–31 (8th Cir. 1997); *United States v. Vozzella,* 124 F.3d 389, 392 (2d Cir.1997); *United States v. Saadeh,* 61 F.3d 510, 523 (7th Cir.1995); *United States v. Walgren,* 885 F.2d 1417, 1427 (9th Cir.1989). In injecting content to this phrase, the Court draws from principles pertinent to *Brady–Bagley* claims. The obligations of the United States Attorney's

Office in Los Angeles are institutional and do not depend upon the knowledge of the individual prosecutor who is conducting the trial. Thus, the Court would attribute the knowledge of one prosecutor involved in the Camarena investigation to another who is also on the case. *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Thomas v. Cardwell,* 626 F.2d 1375, 1381 (9th Cir.1980), *cert. denied,* 449 U.S. 1089, 101 S.Ct. 881, 66 L.Ed.2d 816 (1981). Similarly, the Court would impute to the prosecutor the knowledge of other government officials operating on behalf of the Camarena prosecution team. *See Kyles,* 514 U.S. at 437–38, 115 S.Ct. at 1567–68; *Boyd v. French,* 147 F.3d 319, 1998 WL 324314, at *9 (4th Cir. June 19, 1998); *Sanchez v. United States,* 50 F.3d 1448, 1453 (9th Cir.1995). But the Court does not read the phrase "should have known" so broadly as to impose under the Due Process Clause a duty on the prosecutor or other government officials to go beyond the "prosecution team" in search of information contradicting the testimony or evidence in question. Someone within the entity, *i.e.,* some government official participating in the investigation, must have information clearly demonstrating the falsity of testimony or evidence. *Accord United States v. Duke,* 50 F.3d 571, 577 (8th Cir.) (citing *United States v. Tierney,* 947 F.2d 854, 860–61 (8th Cir. 1991)), *cert. denied,* 516 U.S. 885, 116 S.Ct. 224, 133 L.Ed.2d 154 (1995); *United States v. Krasny,* 607 F.2d 840, 844–45 (9th Cir.1979), *cert. denied,*

testimony was false; and (3) the false testimony was material. *See Napue,* 360 U.S. at 269, 79 S.Ct. at 1177. The knowing use of false testimony is material if there is *any reasonable likelihood* that the false testimony, coupled with the evidence properly presented at trial, *could have affected* the judgment of the jury. *See Napue,* 360 U.S. at 271–72, 79 S.Ct. at 1178–79; *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). If the movant succeeds in demonstrating constitutional error, the Court must then satisfy itself, following a review of the record, that the admission of the false testimony was harmless, *i.e.,* that the testimony did not have "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting and adopting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed.2d 1557 (1946), as the standard for reviewing constitutional trial errors in habeas cases and rejecting "harmless-beyond-a-reasonable-doubt" standard announced in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *see also Gilday v. Callahan,* 59 F.3d 257, 267–68 (1st Cir.1995) (using *Brecht* to review a perjured-testimony claim on collateral review of a petition for writ of habeas corpus), *cert. denied,* 516 U.S. 1175, 116 S.Ct. 1269, 134 L.Ed.2d 216 (1996); *United States v. Ross,* 40 F.3d 144, 146 (7th Cir.1994) (applying *Brecht* to § 2255 motion).[38]

▮ If the testimony proves to be false, but a movant cannot demonstrate that the prosecution knew or should have known that the testimony was false, *i.e.,* the evidence indicates the prosecution innocently or unwittingly used perjured testimony, the false testimony may nevertheless proceed as a regular *Brady–Bagley* claim (described below), tracking with only one exception[39] the elements and definition of materiality applicable in those cases. *See United States v. Young,* 17 F.3d 1201, 1203–04 (9th Cir.1994); *United States v. Endicott,* 869 F.2d 452, 455–56 (9th Cir.1989); *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991).

▮ To succeed on a *Brady–Bagley* claim, a movant must demonstrate that (1) the prosecution withheld exculpatory or impeachment evidence; (2) the prosecution knew or should have known[40] during the proceedings of the evidence's existence; (3) the defendant did not possess the evidence, nor could he have obtained it with reasonable diligence; and (4) the evidence was material. *See Paradis v. Arave,* 130 F.3d 385, 392 (9th Cir.1997); *Routly v. Singletary,* 33 F.3d 1279, 1285 (11th Cir.1994), *cert. denied,* 515 U.S. 1166, 115 S.Ct. 2627, 132 L.Ed.2d 867 (1995); *United States v. Aichele,* 941 F.2d 761, 764 (9th Cir.1991). Evidence is material in this context "only if there is a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding *would* have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (emphasis added).[41] Satisfying the ele-

---

445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 775 (1980).

**38.** In those rare cases where the record is so evenly balanced that the Court is in "grave doubt" about whether the error was harmless, the Court must treat the error as not harmless and grant the movant habeas relief. *See O'Neal v. McAninch,* 513 U.S. 432, 438, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995).

**39.** When a defendant who fails to prove actual or constructive knowledge of the falsity of testimony proceeds instead to have the effect of false testimony tested via a regular *Brady–Bagley* claim, the defendant need not of course prove in the course of making out the *Brady–Bagley* claim that the prosecution knew or should have known during the proceedings of the existence of evidence demonstrating the falsity of the state-

ments. This follows because the inability to prove actual or constructive knowledge under a *Mooney–Napue* claim naturally precludes any ability to prove the same in a *Brady–Bagley* claim. We permit a defendant to move forward despite his inability to prove this element because a "conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness." *Young,* 17 F.3d at 1203–04.

**40.** The definition of "should have known" in this context is the same as that under a *Mooney–Napue* claim. *See* footnote 37, *supra.*

**41.** It is important to observe that a defendant's burden of demonstrating materiality in the *Brady–Bagley* context is more onerous than that required of the defendant on a *Mooney–Napue* per-

noted above automatically entitles the movant to habeas relief; there is no need for harmless-error review on this type of claim. *See Kyles,* 514 U.S. at 435–36, 115 S.Ct. at 1566–67.

■ Matters are complicated when a defendant raises, as Zuno–Arce has here, both *Mooney–Napue* and *Brady–Bagley* claims. The difficulty arises because the Supreme Court has recently stated that the determination of materiality, at least in the *Brady–Bagley* context, must be made on the basis of the entire record, considering all the undisclosed evidence collectively. *See Kyles,* 514 U.S. at 436, 115 S.Ct. at 1567. Considering all the undisclosed matters collectively in a mixed case is awkward because the measure of materiality depends on the nature of the transgression; some fall under the *Napue* definition of materiality while others under the *Bagley* definition. Because no reported decision in our circuit has had occasion to reach this issue, the Court now sets forth the manner in which a mixed case should be handled.

When presented with a mixed case the Court must first address the *Mooney–Napue* claim. If the defendant succeeds on that claim, then habeas relief must be granted and a new trial ordered (if appropriate). If, however, the movant fails to succeed on the *Mooney–Napue* claim because he cannot establish actual or constructive knowledge of falsity, *see Young,* 17 F.3d at 1203–04, materiality under the Napue standard, or because

the error was harmless under *Brecht, see Gilday,* 59 F.3d at 269–72 & n. 20, the Court should next consider the false testimony in conjunction with the defendant's *Brady–Bagley* claim.[42]

### A

■ The Court first addresses Zuno–Arce's *Mooney–Napue* claims. He must at the outset demonstrate that the testimony of either Godoy–Lopez or Lopez–Romero was actually false. Nearly every fact which Zuno–Arce presents in support of this issue is barred by the AEDPA's one-year period of limitations. *See* Comprehensive Reply to All Government Oppositions 25–26 (CR docket # 2253) (discussing all of the "newly discovered" impeachment evidence pertaining to Godoy–Lopez and Lopez–Romero).[43] The remaining proffer is insufficient to even warrant an evidentiary hearing on this issue. First, Zuno–Arce again submits that Cervantes–Santos's declaration provides evidence that Godoy–Lopez and Lopez–Romero lied during *Zuno II,* namely that Godoy–Lopez and Lopez–Romero's placement of the kidnapping meetings was inconsistent with Cervantes–Santos's testimony on the matter. The Court has already rejected this theory,[44] as has the Court of Appeals, *see Zuno–Arce,* 44 F.3d at 1422–23. *See also United States v. Jordan,* 150 F.3d 895, 1998 WL 417134, at *5 (8th Cir. July 27, 1998) ("A challenge to evidence through another witness or prior inconsistent statements is insufficient to es-

---

jured-testimony claim. *See United States v. Steinberg,* 99 F.3d 1486, 1490–91 (9th Cir.1996); *United States v. Gonzales,* 90 F.3d 1363, 1368 n. 2 (8th Cir.1996); *Gilday v. Callahan,* 59 F.3d 257, 267 (1st Cir.1995), *cert. denied,* 516 U.S. 1175, 116 S.Ct. 1269, 134 L.Ed.2d 216 (1996); *United States v. Alzate,* 47 F.3d 1103, 1109–10 & n. 7 (11th Cir.1995); *Kirkpatrick v. Whitley,* 992 F.2d 491, 497 (5th Cir.1993). The lower materiality burden applies when the prosecution uses false testimony which he knows or should know is false because such a situation involves prosecutorial misconduct and a corruption of the truth-seeking function of the trial.

The Court also notes, however, that the defendant's burden under *Brady–Bagley* is less demanding than that necessary to pass through the *Schlup* gateway of actual innocence. *See Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566 ("The question [in the *Brady–Bagley* context] is not whether the

defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."); *Carriger v. Stewart,* 132 F.3d 463, 479 (9th Cir.1997) ("A 'reasonable probability' does not require showing by a preponderance that the outcome would have been different."), *cert. denied,* —— U.S. ——, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998).

42. For example, if a piece of false testimony standing alone does not pass muster under the Napue standard, it may nevertheless succeed under the more stringent *Bagley* standard when coupled with other undisclosed exculpatory or impeachment evidence.

43. *See* the discussion *supra* in Part V.

44. *See* the discussion *supra* in Part IV.B.

tablish prosecutorial use of false testimony."); *United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir.1997) ("The fact that a witness may have made an earlier inconsistent statement, or that other witnesses have conflicting recollections of events, does not establish that the testimony offered at trial was false."); *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir.1993) (holding inconsistent testimony insufficient to state a claim of false testimony). To earn the right to an evidentiary hearing, a movant is required to allege *specific facts* which, if true, would entitle him to relief. *See Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir.1997); Rule 4(b) of the Rules Governing Section 2255 Proceedings. The Rules Governing Section 2255 do not authorize fishing expeditions, and " 'conclusory allegations unsupported by specifics' ... will not entitle one to discovery or a hearing." *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir.1996) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977)). All things considered, the defendant's proffer on the issue of falsity constitutes no more than conclusory allegations.[45] Zuno–Arce is not entitled to relief on his *Mooney–Napue* claim, and because the testimony has not been proven false, the matter may not continue as a *Brady–Bagley* claim.

Even assuming the testimony of the two witnesses was false, Zuno–Arce has failed to identify specific facts which would entitle him to relief, let alone an evidentiary hearing, on whether the Government knew or should have known that the testimony was false. Zuno–Arce submits that the Government impliedly acknowledged the unreliability of Godoy–Lopez and Lopez–Romero when it dismissed murder charges against Esequiel Godinez–Cervantes; Godoy–Lopez and Lopez–Romero supposedly would have been the two witnesses against Godinez–Cer-

vantes. *See* Comprehensive Reply to All Government Oppositions 26–27 (CR docket # 2253). This *argument* does not, however, set forth specific facts which could lead the Court to find that the Government knew that Godoy–Lopez and Lopez–Romero's testimony in *Zuno II* was false. Moreover, to the extent Zuno–Arce attempts to utilize the impeachment evidence pertaining to Godoy–Lopez and Lopez–Romero on this issue, that proffer is also barred by the period of limitations. Thus, on this ground, Zuno–Arce is also not entitled to relief on his *Mooney–Napue* claim.

**B**

The Court next addresses Zuno–Arce's *Brady–Bagley* claims. In the next three sections, the Court identifies each item of purportedly undisclosed evidence, determines whether the evidence satisfies the first three prongs of a *Brady–Bagley* claim, and then evaluates collectively the materiality of the evidence properly before the Court. *See id.* at 436 n. 10, 115 S.Ct. at 1567 n. 10.

**1**

Zuno–Arce alleges that the Government failed to disclose (1) that the Government promised Godoy–Lopez and Lopez–Romero during trial, and paid in 1995, each a $100,000 lump-sum payment for their testimony; (2) information regarding Agent Berrellez's recruiting of potential witnesses, (3) the unredacted September 17, 1992 DEA–6 report, (4) that Cervantes–Santos falsely implicated Zuno–Arce in *Zuno I* at the Government's request, (5) Agent Berrellez and AUSA Medrano promised Cervantes–Santos a lump-sum payment of $200,000 for his testimony in *Zuno I,* and (6) that the Government paid Cervantes–Santos and his family before and during *Zuno I* more than was disclosed at trial.[46]

---

**45.** It is also important to note that Zuno–Arce has never filed a motion to permit discovery on this issue or any other in the ten months this motion has been before the Court. *See* Rule 6 of the Rules Governing Section 2255 Proceedings; C.D.Cal.Rule 7.4.2 (1998); C.D.Cal. Rule 7.4 (1993).

**46.** Zuno–Arce did identify other items of evidence, each of which could conceivably consti-

tute a separate *Brady–Bagley* claim, but for the reasons states *supra* in Part V, those claims are barred by the AEDPA's one-year period of limitations and have already been dismissed: (1) evidence that the meetings recounted by Godoy–Lopez and Lopez–Romero could not have occurred at the Las Americas Hotel because the suites were too small; (2) evidence that Godoy–Lopez and Lopez–Romero could not have seen Bartlett–Diaz at meetings in early February 1985

**2**

**a**

■ The first basis for the *Brady–Bagley* claim is the allegation that the Government promised Godoy–Lopez and Lopez–Romero during trial that each would receive a $100,-000 lump-sum payment for their testimony. The Government does not dispute that Godoy–Lopez and Lopez–Romero each received a lump-sum final payment of $100,000 in late 1995, three years after the trial. *See* Opposition to Motion for New Trial 39. It disputes, however, the contention that it promised Godoy–Lopez and Lopez–Romero this amount or any similar amount either before or during *Zuno II*. No declarant has stepped forward to prove, or even allege for that matter, that Godoy–Lopez and Lopez–Romero were promised the $100,000 payment before or during the trial. Again, Zuno–Arce's papers are filled only with conclusory allegations. Rather, the record conclusively demonstrates that the decision to pay the witnesses the $100,000 lump sum came after *Zuno II*, in an effort to cease the $3,000 monthly subsistence payments that both witnesses had been previously receiving before, during, and after the trial (as was disclosed). Because there was in essence no exculpatory or impeachment evidence to disclose, this cannot be a basis for a *Brady–Bagley* claim.

**b**

■ Zuno–Arce next alleges that the Government wrongly withheld information regarding Agent Berrellez's "recruitment techniques." Evidence submitted to the Court indicates that on December 11, 1991, Agent Berrellez was stopped for driving while intoxicated. The Riverside County District Attorney's Office dismissed all charges against Agent Berrellez on the ground that he was acting within his official duties when the incident occurred. The County had apparently based its decision on a letter submitted by Agent Berrellez's superior; the letter details how Agent Berrellez had interviewed four potential witness in the Camarena investigation while at a residence in Los Angeles. One potential witness had insisted that he speak alone with Agent Berrellez, so the two went to a restaurant where, presumably, Agent Berrellez consumed the alcohol which led to his arrest for DUI. Zuno–Arce focuses, however, on portions of the letter which discuss Agent Berrellez's active participation in the "recruitment and development of informants and witnesses," a matter for which Berrellez was not, in light of his position as Group Supervisor, ordinarily responsible. *See* Tab 6 *in* Declarations and Exhibits in Support of Petitioner's Response to Order to Show Cause Re: Dismissal of § 2255 Motion as Untimely. According to the defendant, the letter constitutes exculpatory or impeachment evidence because it raises general concerns about how informants were recruited during the Camarena investigation—namely whether they received too much personal attention. Moreover, Zuno–Arce alleges, because Godoy–Lo-

because Bartlett–Diaz was in Mexico City; (3) materials found in the case files of Mexican authorities, including statements made by Godoy–Lopez to Mexican authorities regarding his relationships with cartel members and his involvement in the murder of Camarena; (4) Godoy–Lopez has a reputation for dishonesty in his community; (5) Godoy–Lopez covered up his involvement in four robberies; (6) evidence contradicting Godoy–Lopez's testimony regarding the existence of the landing strip at the "number one military camp" outside of Mexico City; (7) evidence contradicting Godoy–Lopez's testimony regarding his withdrawal of "suitcases" of U.S. dollars from a Mexican bank; (8) that the Government interceded on Lopez–Romero's behalf on the spousal abuse charges; (9) that Lopez–Romero made false statements to the police when he was arrested for spousal abuse; (10) Lopez–Romero orchestrated a cover-up of his

involvement in a 1984 murder; and (11) evidence contradicting Lopez–Romero's testimony that Zuno–Arce was present during the April 1984 drug stop.

The Court does not consider Zuno–Arce's claim that the Government somehow violated *Brady–Bagley* when it decided to dismiss a case brought against Esequiel Godinez–Cervantes, *see* Comprehensive Reply 38–39; Zuno–Arce has no standing to challenge the Government's disclosure (or nondisclosure) of information in that case. Other bases for a *Brady–Bagley* claim which were raised and briefed for the first time in the defendant's Response to Order to Show Cause Re: Dismissal or the Comprehensive Reply have also not been considered. *See* Comprehensive Reply 39–40, 43. The defendant was required to seek leave from the Court to add these new claims, something he never sought to do.

pez and Lopez–Romero may have been one of the four potential witnesses at issue, "disclosure of the letter would have provided powerful material for cross-examination of [Godoy–]Lopez and [Lopez–] Romero." Comprehensive Reply 42. Although the exact exculpatory nature of this letter is dubious, the Court will consider these facts when analyzing materiality.

c

The defendant's third basis for relief is the information contained in the unredacted September 17, 1992 DEA–6 report, which the Court has previously addressed. In December 1992, the Government disclosed to Zuno–Arce's counsel several DEA–6 reports for Ramon Lira, an informant who was not called to testify. The Government acknowledges that on the report dated September 17, 1992 it redacted three paragraphs which the Government felt were not discoverable under the Jencks Act or *Brady*. The redacted portions describe a meeting at a house owned by Fonseca–Carrillo. Lira accompanied Fonseca–Carrillo to the house sometime in November 1984, and waited while Fonseca–Carrillo spent about an hour in one of the offices. Thinking that Fonseca–Carrillo might have left, Lira looked into the room and saw seated around the table Fonseca–Carrillo, Miguel de la Madrid (then-President of Mexico), Jose Lopez–Portillo (a past president of Mexico), and Alvarez del Castillo. In front of Alvarez del Castillo was a stack of United States currency. Lira heard the words "bufalo" and "Camarena" while looking into the room, which he did for only fifteen to twenty seconds. Zuno–Arce argues that the redacted portions of the report demonstrate that Fonseca–Carrillo and oth-

ers knew already in November 1984 that Camarena was responsible for the cartel's losses, thus contradicting the testimony of Godoy–Lopez and Lopez–Romero. This allegation satisfies the first three prongs of a *Brady–Bagley* claim.

d

Zuno–Arce's next basis for relief under *Brady–Bagley* is his contention that the Government failed to disclose that Cervantes–Santos falsely implicated Zuno–Arce in *Zuno I* at the Government's request.[47] Zuno–Arce has the burden of proving by a preponderance of the evidence that Cervantes–Santos's testimony was false and that the Government knew or should have known as much before or during *Zuno II*. The main support for Zuno–Arce's position is Cervantes–Santos's July 1, 1997 declaration in which he claims the Government suborned his perjury.[48] Having conducted an extensive evidentiary hearing on this matter, the Court now concludes that Cervantes–Santos did not testify falsely when he implicated Zuno–Arce at the first trial. Rather, it appears clear from the record that Cervantes–Santos recanted his *Zuno I* testimony as a result of personal greed and feelings that the DEA had abandoned him and his family.

As a preliminary matter, the Court looks upon Cervantes–Santos's July 1997 recantation with extreme suspicion, for there "is no form of proof so unreliable as recanting testimony.... Those experienced in the administration of the criminal law know well its untrustworthy character." *Carriger v. Stewart,* 132 F.3d 463, 483 n. 1 (9th Cir.1997) (quoting *State v. Krum,* 183 Ariz. 288, 903 P.2d 596, 602 (Ariz.1995)) (Kozinski, J., dissenting).[49] "Recanting testimony is easy to

---

**47.** This claim is not treated as a *Mooney–Napue* claim because the alleged knowing use of Cervantes–Santos's false testimony did· not occur at *Zuno II* where Zuno–Arce was ultimately convicted. The purportedly false testimony was used during *Zuno I*. Because the retrial cured any possible *Mooney–Napue* issues, this claim proceeds as a straight forward *Brady–Bagley* claim.

**48.** The catalyst for the July 1, 1997 declaration was a June 13, 1997 interview that Cervantes–Santos gave to counsel for Zuno–Arce while in Los Angeles. The substance of that recorded

interview is memorialized in the July 1, 1997 declaration. The Court notes for the record that the English translation of the July 1, 1997 declaration submitted by the defendant is inaccurate. *Compare* Exhibit A *in* Declaration of John Brown and Exhibits in Support of Motion for New Trial *with* Exhibit A *in* Appendix of Exhibits filed in Support of Opposition to Motion for New Trial.

**49.** *See also Dobbert v. Wainwright,* 468 U.S. 1231, 1233, 105 S.Ct. 34, 36, 82 L.Ed.2d 925 (1984) ("Recantation testimony is properly viewed with great suspicion.") (Brennan, J., dissenting from denial of certiorari); *Olson v. Unit-*

find but difficult to confirm or refute: witnesses forget, witnesses disappear, witnesses with *personal motives* change their stories many times, before and after trial." *Carriger*, 132 F.3d at 483 (emphasis added) (Kozinski, J., dissenting). Moreover, a repudiated recantation, as has occurred in this case, "is even less worthy of serious consideration." *Id.; see also United States v. Miller*, 987 F.2d 1462, 1466 (10th Cir.1993).

Zuno–Arce elicited testimony from Cervantes–Santos which clearly demonstrates that when Cervantes–Santos recanted in mid–1997 he was extremely unhappy with the DEA. Cervantes–Santos had been living in the United States with his family since the first trial, all the while receiving monthly $3,000 subsistence payments from the United States Government. In September 1995, however, the Government decided to no longer financially support Cervantes–Santos, and he was given a final severance payment of $100,000. But Cervantes–Santos was upset that much of the money went to pay taxes and felt he was entitled to more, so in April 1996 he voiced his objections to representatives of the DEA. *See* Rocio Mercado Declaration ¶ 2 *in* Opposition to Motion for New Trial. His request for additional funds was denied, and Cervantes–Santos had no reliable means of supporting himself. To make matters worse he was informed that the United States Marshal's Service had denied him admission to the Witness Security Program. *See id.* ¶ 3. In March 1997, Cervantes–Santos went to the United States Attorney's Office to complain that his family in Mexico was in danger and that he wanted the DEA to facilitate their return to the United States. Cervantes–Santos's own immigration papers would soon expire, and he too found himself in a situation where he would have to return to Mexico and possibly face those whom he had implicated during the Camarena investigation.

In May 1997, Cervantes–Santos complained to members of the Mexican press that the DEA had reneged on their promises of witness program protection, monetary compensation, and legal residency. A story was published in *La Opinion* on May 2, 1997. *See* Exhibit G *in* Appendix of Exhibits Filed in Support of Opposition to Motion for New Trial ("I feel I'm ruined. I can't return to Mexico because *my life is in danger*, the only thing I want is for the Government to live up to its word.... The Government of the United States has betrayed him. They offered him things they haven't fulfilled for him and he can't go back to his country, which he left to cooperate with this country, which now is turning its back on him."). It is important to note that Cervantes–Santos reaffirmed his *Zuno I* testimony to the Mexican Press: "When asked who killed Camarena, Cervantes repeated again that everybody at those meetings [including Zuno–Arce] wished for Camarena's death, since all of them, together and in partnership, ordered his death." *Id.*

In early June 1997, Cervantes–Santos, frustrated with the DEA, contacted Zuno–Arce's legal counsel with a request for help. According to James Blancarte, an attorney working for Zuno–Arce, Cervantes–Santos spent much of the June meeting complaining about how the DEA had hung him out to dry. Zuno–Arce's counsel offered to help Cervantes–Santos; they discussed money and Blancarte referred him to an immigration attorney. Ultimately, Zuno–Arce's counsel informed Cervantes–Santos that if it were necessary for him to return to Mexico, he and his family could be placed in the Mexican Witness Protection Program.

The Court finds that this switch of sides was precipitated by Cervantes–Santos's knowledge that he would soon be returning to Mexico on account of his expired immigration papers. His fear of harm to himself and his family in Mexico was real and well founded, and it served his personal interests to ingratiate himself with those who had the power to literally direct his future in Mexico. It is under these circumstances of great des-

*ed States*, 989 F.2d 229, 231 (7th Cir.) ("It is a truism that our courts treat recantations with skepticism."), *cert. denied*, 510 U.S. 895, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993); *United States v. Provost*, 969 F.2d 617, 620 (8th Cir.1992)

("The district court began by correctly observing that new trial motions based on recanted testimony are immediately suspect."), *cert. denied*, 506 U.S. 1056, 113 S.Ct. 986, 122 L.Ed.2d 139 (1993).

peration and offers of beneficence that Cervantes–Santos provided Zuno–Arce's counsel with a recantation, some seven years after his trial testimony, which included allegations of outrageous prosecutorial misconduct—something Zuno–Arce had sought to prove but failed while on direct appeal. *See Zuno–Arce*, 44 F.3d at 1423 ("Zuno–Arce has offered no evidence whatsoever for prosecutorial misconduct except for the inference from discrepancies [between the testimony in *Zuno I* and *Zuno II* ].").[50]

On or around July 2, 1997, John Brown drove Cervantes–Santos to Tijuana, Mexico where Cervantes–Santos then traveled to Guadalajara to rejoin his family. Several months later, perhaps in October 1997, Cervantes–Santos and his family entered the Mexican Witness Protection Program at a military base in Mexico City. Unfortunately for Cervantes–Santos, however, the witness protection program was not all he had hoped it would be. Cervantes–Santos testified that he was being held at the military base against his will, that he had been mistreated, and that the accommodations were meager at best.

The Court finds that it is at this time that Cervantes–Santos realized that his renewed relationship with officials and persons in Mexico was not as fruitful and fulfilling as had been represented; he again feared for his life and the safety of his family. He was in fact more miserable at the military base than he had been in the United States under the auspices of the DEA. So Cervantes–Santos left the military base in late December 1997[51] and made his way to Guadalajara where, in mid-January 1998, he spoke with representatives of the DEA. It is at this time that he gave a statement repudiating his July 1, 1997 declaration. In February 1998, the United States provided for Cervantes–Santos and his family's return to Los Angeles, California.[52]

The final word on the subject has been Cervantes–Santos's vehement reaffirmation of his *Zuno I* testimony during the Court's evidentiary hearing. Although Cervantes–Santos continues to claim that representatives of Zuno–Arce and Bartlett–Diaz had forced him to recant, the Court finds that Cervantes–Santos likely had the most to do with his own recantation. As is evident from the events that transpired in this case, Cervantes–Santos's personal motives and financial status had dramatically changed since *Zuno I*, he was desperate and in need of financial and physical security—two things that Zuno–Arce's people promised they could provide to him; promises that never materialized.

In sum, it appears from the record that Cervantes–Santos recanted his *Zuno I* testimony solely for personal gain, and not because his testimony was in fact false. Zuno–Arce has failed to prove otherwise. This claim may not go forward.

**e**

Zuno–Arce's next basis for relief is that the Government failed to disclose that Agent Berrellez and AUSA Medrano had promised before *Zuno I* that Cervantes–Santos would receive a lump-sum payment of $200,000 for his testimony and cooperation. The evidence submitted to prove that such a promise was made is Cervantes–Santos's June/July 1997 recantation, the substance of which the Court has already rejected as having been fabricated. Having failed to satisfy his burden of proof on this issue, this portion of Zuno–Arce's *Brady–Bagley* claim may not go forward.

**f**

Zuno–Arce's final basis for a *Brady–Bagley* claim is that the Government failed to disclose that Cervantes–Santos and his family received, before and during *Zuno I*, more money than was disclosed. Zuno–Arce claims: "On November 23, 1989, the DEA

---

**50.** Testimony at the evidentiary hearing established that John Brown, the private investigator, prepared the July 1, 1997 declaration with the assistance of Michael Lightfoot and Edward Medvene, counsel for Bartlett–Diaz and Zuno–Arce, respectively.

**51.** Cervantes–Santos claims he escaped, Zuno–Arce insists Cervantes–Santos left voluntarily.

**52.** Cervantes–Santos's purported conversation with John Brown in March 1998 in which he disavows his repudiation of the recantation is of little probative value.

interviewed Cervantes who had been sent to the DEA by Antonio Garate–Bustamonte, his former boss. Some days later, after receiving $12,000 from a DEA intermediary (not previously disclosed to Zuno counsel), a $3,500 advance from the DEA, [and] a promise of $6,000 per month (only $3,000 payments disclosed to counsel)." Motion for New Trial 6.[53] The record of the proceedings belies this contention; the payments made to Cervantes–Santos were the subject of extensive direct- and cross-examination during *Zuno I*. The jury heard evidence that the Government paid Cervantes–Santos before the trial (between November 24, 1989 and May 4, 1990) $36,000, an amount averaging about $7,000 per month, *see* Exhibits 7, 9, 17, 19 & 20 *in* Appendix of Trial Transcript References in Support of Opposition to Motion for New Trial; $3,000 per month (and sometimes more) during the trial, *see* Exhibits 2, 11 & 29; and that his monthly stipend of $3,000 plus would continue as long as Cervantes–Santos remained "in danger," an indeterminate period, *see* Exhibit 29. Going into *Zuno II*, Zuno–Arce's counsel was thus well aware of the pecuniary payments Cervantes–Santos had received. At the evidentiary hearing, however, the Government admitted to paying Cervantes–Santos's brother, Manuel Cervantes, approximately $35,140 in the six months before *Zuno I, see* Stipulation and Order Re: Monetary Payments 2; this information was *not* disclosed to Zuno–Arce's counsel prior or during *Zuno II* and the Court will thus proceed with this issue below.

**3**

The Court now addresses whether the evidence that has been withheld is "material," *i.e.,* whether there is a reasonable probability that had the evidence been disclosed to the defense, the result of *Zuno II* would have been different. *See Bagley,* 473 U.S. at 682,

105 S.Ct. at 3383. The evidence presented at trial against Zuno–Arce at *Zuno II* has already been recounted *supra* in Part IV.A, as have the lengths counsel went to impeach the credibility of Godoy–Lopez and Lopez–Romero during that trial. The defense never received, and the jury never heard, however, that:

—Agent Berrellez *may* have recruited Godoy–Lopez and Lopez–Romero by taking them to restaurants where they would all consume alcohol

—In November 1984, an informant, Ramon Lira, eavesdropped on a meeting between Fonseca–Carrillo and others where over the course of fifteen to twenty seconds Lira overheard the words "bufalo" and "Camarena"

—Cervantes–Santos's brother, Manuel Cervantes, received between November 24, 1989 to May 4, 1990 approximately $35,140 from the Government

The Court concludes that had the jury heard this additional evidence during *Zuno II* the results of the proceedings would not have been different. Agent Berrellez's recruitment technique would likely have little bearing on this case. First of all, Zuno–Arce has failed to offer evidence that Godoy–Lopez or Lopez–Romero were wooed in such a manner by Agent Berrellez. And second, even if Berrellez had consumed alcohol over dinner with Godoy–Lopez and Lopez–Romero, Zuno–Arce has not explained why this evidence would provide useful impeachment evidence. *See* Comprehensive Reply 42. Zuno–Arce's reliance on *United States v. Boyd,* 55 F.3d 239 (7th Cir.1995), in support of his argument is misplaced. *Boyd* involved substantially more than consuming alcohol with a potential witness; the prisoner witnesses in that case received sexual favors and illegal drugs. *See id.* at 246. Lira's

53. Following the evidentiary hearing, the Court ordered the defendant to submit a written argument and summary of evidence presented at the hearing in support of his motion. Zuno–Arce's submission does not present a single piece of evidence or argument related to this claim. *See* Defendant–Petitioner's Summary of Evidence in Support of "Cervantes Issues" Raised in Motion

to Vacate, Set Aside or Correct Sentence. Zuno–Arce attempts to "incorporate by reference" codefendant Juan Ramon Matta–Ballesteros' submission on this issue. *See id.* 3 n. 2. But this is something he is not permitted to do. *See Swanson v. U.S. Forest Service,* 87 F.3d 339, 345 (9th Cir.1996). The Court ordered each defendant to submit *their own* argument.

statement provides little more than evidence that Fonseca–Carrillo and others *may* have already known in November 1984 that Camarena was responsible for the raid at "El Bufalo." The information does not, however, refute Godoy–Lopez's testimony regarding meetings occurring prior to November 1984. Thus, at most the matter calls into question Godoy–Lopez's recollection of what occurred at some of the meetings. When coupled with all the other impeachment evidence presented during *Zuno II*, this information becomes inconsequential. Zuno–Arce's counsel had already argued at the trial that the conspirators already knew Camarena's identity before some of the meetings described by Godoy–Lopez and that Godoy–Lopez's testimony must have thus been mistaken. The jury rejected that position. Moreover, had Zuno–Arce called Lira to the stand during *Zuno II* to further explicate what was heard in November 1984, the Government would have likely elicited testimony from Lira which *further* implicated Zuno–Arce. Lira's other DEA–6 reports reflect that Lira had seen Zuno–Arce meeting with cartel members Caro–Quintero, Fonseca–Carrillo, Barba–Hernandez, Matta–Ballesteros, and Felix–Gallardo, among others, in January and February 1985, *see* Exhibit U *in* Appendix of Exhibits Filed in Support of Opposition to Motion for New Trial, that Lira had seen Zuno–Arce on February 6 & 7, 1985 at 881 Lope de Vega, *see* Exhibit V *in* Appendix of Exhibits Filed in Support of Opposition to Motion for New Trial, and that Lira had seen Zuno–Arce and others later discuss what should be done with the bodies of Camarena and his pilot, *see id.* Thus, presenting Lira to the jury would have done more harm than good to Zuno–Arce's cause. Finally, evidence that Cervantes–Santos's brother—who neither testified at *Zuno I* nor *Zuno II* —received a monthly stipend before *Zuno I* borders on irrelevant. The Court remains confident in the outcome of *Zuno II*.

## VIII

The Court DISMISSES with prejudice defendant Zuno–Arce's motion to vacate, set aside, or correct sentence to the extent indicated in Part V, *supra,* and otherwise DE-NIES the motion for the reasons set forth above.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve, by telefax or by United States mail, copies of this Order on counsel for the parties in this matter.